Joseph V. SCELSA, individually and as Director of the John D. Calandra Italian American Institute of the City University of New York

v.

CITY UNIVERSITY OF NEW YORK and W. Ann Reynolds, as Chancellor of the CITY UNIVERSITY OF NEW YORK.

No. 92 Civ. 6690 (CBM).

United States District Court, S.D. New York.

Nov. 18, 1992.

Phillip F. Foglia, White Plains, N.Y., Howard R. Birnbach, Great Neck, N.Y., Michael Marinaccio, White Plains, N.Y., for plaintiff.

Barbara B. Butler, Charles F. Sanders, New York City, Gayle A. Sunnlivan, Jane M. Sovern, New York City, for defendants.

## OPINION ON MOTION FOR PRELIMINARY INJUNCTION

MOTLEY, District Judge.

Plaintiff Dr. Joseph V. Scelsa, the Director of the John D. Calandra Italian American Institute ("Institute") of the City University of New York ("CUNY"), is before this court seeking a preliminary injunction barring defendants from employment discrimination against Italian–Americans and from relocating the Institute and transferring its operations to several different units of CUNY located around the city. Plaintiff's complaint alleges, in essence, that Italian–Americans have been discriminated against in employment because of their national origin, particularly

with respect to recruitment and promotion of faculty by defendants.

The complaint also alleges that in retaliation for plaintiffs having filed a complaint with the United States Department of Labor charging CUNY with discrimination against Italian Americans in violation of Title VI of the Civil Rights Act of 1964, Dr. Scelsa has been stripped of his authority as director of the Institute and the Institute's programs have been transferred to other CUNY units. For the reasons set forth below, a preliminary injunction is granted enjoining discrimination against Italian–Americans with respect to faculty recruitment and promotions and enjoining the dismemberment of the Institute and the removal of Dr. Scelsa as director of the Institute, pending the trial of this action.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I. FINDINGS OF FACT

#### A. *Cuny is a State Institution*

City University of New York is a self-governing assemblage of 21 educational subdivisions. The nine senior 4–year colleges are funded by the State of New York, see N.Y. Education Law § 6230 (McKinney 1992). The seven community colleges are funded jointly by the State and the City of New York. N.Y. Education Law § 6304 (McKinney 1992). While the College of Staten Island is a four-year senior college, it also accepts students who seek a two-year degree, and thus receives some City funds to help cover the costs of those students. N.Y. City Education Law § 6221(C)(i). The Italian American Institute is supported solely through state funds (Tr. 683). During the fiscal year 1992–1993, the Institute was allotted some

$912,000; during fiscal year 1991–1992, roughly $906,000; and in fiscal year 1990–1991, $860,000 (Tr. 987).

#### B. *History of Italian–Americans and the Italian American Institute at Cuny*

In the mid- to late–1970s concern about the historical under-representation of Italian–Americans on the CUNY faculty and staff and the perception that there was widespread discrimination against Italian–Americans by CUNY led to action on the part of both CUNY and elected officials.

In 1976, Chancellor Kibbee of CUNY issued a directive to the CUNY Council of Presidents concerning the educational under-representation of Italian–Americans in the student body and on the faculty ("the Kibbee Memorandum"). Chancellor Kibbee stated in that letter that "I am designating Italian–Americans as an affirmative action category for this University *in addition to those so categorized under existing Federal statutes and regulations.* I also have instructed the Affirmative Action Office to include Italian–Americans in the data collected for affirmative action purposes." (Plaintiff's exhibit 4) (emphasis supplied).[1]

In 1978, State Senator John Calandra, Chair of the Italian–American Legislator's Caucus, prepared a Report entitled "A History of Italian–American Discrimination at CUNY" (Plaintiff's Exhibit 16) ("Calandra Report"). In this Report Senator Calandra set forth the conclusions and beliefs of the Caucus of widespread discrimination against Italian–Americans but noting specifically Chancellor Kibbee's designation of Italian–Americans as an affirmative action group. (Calandra Report at 5). This Report also proposed the creation of an Ital-

---

**1.** Defendants contend that this directive had no effect whatsoever except as a voluntary, non-binding undertaking by CUNY to collect data in regards to Italian–Americans. See, e.g. Defendants' Response to Plaintiff's Proposed Findings of Fact and Conclusion of Law at 2–3. The clear language of the Kibbee Memorandum is to the contrary, e.g., the use of the word "also" to indicate that the University's accumulation of hiring data is in addition to CUNY's designation

of Italian–Americans as an affirmative action group in addition to the federally-recognized groups. Defendants clearly assumed the duty to include Italian–Americans as an affirmative action group. For defendants to argue that this language has no effect is disingenuous. The mere fact that CUNY has not kept its promises to Italian–Americans does not mean that such promises do not exist.

ian–American Institute at CUNY to address the perceived problem of discrimination, whose function would be "to generate a comprehensive guidance program, to develop a complementary cultural component, and to provide the related informational services." (Ex. 16 at 27).

As a result of these actions, the John D. Calandra Italian American Institute was created by the State legislature in 1979. (Tr. 64). Originally, the Institute was an entity separate and independent from CUNY. (Tr. 984). It was reorganized as a division within CUNY by the New York State Legislature in 1984–85. While not technically a "research institute" as defined by CUNY bylaws, it conducts much research into the role, place, and problems of Italian–Americans in New York City and within the CUNY system. In 1989, the Office of Management and Productivity conducted, at the request of the Governor, a management review of the Institute (Ct. Ex. 1, the MAP Report). As noted in the MAP Report, the research component is an active and integral aspect of the Institute, and its activities are coordinated "with CUNY's Office of Institutional Research and Analysis" (MAP Report at 22), indicating that the Institute's research initiatives are integrated with other campus research activities.

Much of the Institute's work is not pursuant to University directive; indeed, it appears from the record that CUNY pays little attention, if any, to the work, goals, and concerns of the Institute and Italian–Americans in general. Instead, much of the Institute's activity arises out of the initiative of its members, particularly its Director, Dr. Scelsa. It is this activity which, plaintiff contends, has drawn the discriminatory ire of the University. It is unclear whether the University dislike of Dr. Scelsa and the institute is motivated by an anti–Italian discriminatory animus. What is clear, however, is that CUNY is seeking to the curtail the independence of the Institute and put Dr. Scelsa on a shorter leash, one on which he lacks the room to bite his master CUNY. The MAP Report advised that CUNY more directly administer the Institute and exercise oversight on its activities. The MAP Report saw the Institute as too dependent on the views and direction of Dr. Scelsa, and not subject enough to the direct control and desires of the CUNY administration. (Ct.Ex. 1, MAP Report at 30–32).

Dr. Scelsa has been director of the Institute since August, 1984. He had also worked in the Office of Student Affairs and Special Programs at the University from September 1980 to October 1981 (Pl. Ex. 40).

The Institute is a central locus for Italian–American activism (See, e.g. Tr. 374–76; 553–54). The Institute currently is engaged in numerous outreach programs directed not only at the Italian–American community but also at fostering and improving intergroup relations. (See, e.g. Tr. at 288–92).

The directive embodied in the Kibbee Memorandum was reaffirmed in 1986 by Chancellor Joseph Murphy ("the Murphy letter"). "In December, 1976, Chancellor Robert J. Kibbee established Italian–American as an Affirmative Action Category within the City University of New York, a decision I now reaffirm. The 1976 action represented a *formal extension* of the Federally defined protected classes for purposes of the University's Affirmative Action Program to include an additional group as a protected class." (Plaintiff's Exhibit 4A) (emphasis added).

Still, the Murphy Letter left dissatisfied many officials and members of the Italian–American community who felt that Italian–Americans still suffered discrimination and were still under-represented at CUNY. In 1988, the New York State Italian–American Legislator's Club communicated its concerns and desires about the situation of Italian–Americans at CUNY to Chancellor Murphy. (Pl.Ex. 17). In this letter the Club conveyed to the Chancellor their frustration with what they perceived to be CUNY's inadequate response to the affirmative action designation of Italian–Americans. In addition, they urged that better space be provided for the Institute at the Graduate Center.

### C. The Proposals to Restructure the Italian American Institute

In 1990, a Committee on Urban Public Higher Education (known as the Massaro Commission, after its Chair, State Supreme Court Justice Massaro) was formed by Italian–American political officials and community activists to investigate and redress perceived discrimination against Italian–Americans at CUNY. (Tr. 464–465). The Massaro Commission recommended, among other things, that the Institute be given more power and responsibilities. (1991 Report of the Advisory Committee on Urban Public Higher Education, Pl.Ex. 15 at 9). It also urged that the Institute be associated with the Graduate School for research purposes, with Dr. Scelsa being elevated to Dean of the Institute (Tr. 471; Pl.Ex. 44, 45).

However, the plan that CUNY eventually decided to adopt was significantly different from that proposed by the Massaro Commission. The CUNY plan, labelled the Volpe plan after President Volpe of the College of Staten Island, the official in charge of assembling it, provided for, inter alia, the relocation of the Italian American Institute to the College of Staten Island (where President Volpe would have authority over it) and the removal of Dr. Scelsa as Director. It appears that defendants want to, in their words, "elevate" the Institute, and in so doing, to sever the outreach, counselling, and research aspects of the Institute. Dr. Scelsa, a thorn in the side of the University, is to be shunted aside as its Director during this reconfiguration, to remain in charge of the outreach function. Not surprisingly, Dr. Scelsa is rather unhappy with this proposal, and foreseeing this outcome, defendants insured that at no time during the planning of this reconfiguration was the plaintiff (or any other member of the Institute, for that matter) made privy to the planning process.

During the latter half of 1991 and the first half of 1992 various university officials, including the Chancellor, Vice–Chancellor Bloom, Vice Chancellor Hershenson, Acting Vice Chancellor Keizs, Deputy Chancellor Mucciolio, and President Volpe of the College of Staten Island, discussed among themselves plans for changing the role, location, and direction of the Institute (Tr. 925–26). Dr. Scelsa was not part of this or any other in this series of meetings, (Tr. 926), nor was any other member of the Institute. The result of all of this is what has come to be known as the Volpe proposal (Defendants' Ex. E), in which the Institute would be transferred to the College of Staten Island, and Dr. Scelsa would be transferred to the admissions office at 31 Street. Fears that the Italian–American community might be ill-served by CUNY's attempt to reconfigure the Institute motivated numerous public officials and Italian–American community activists to contact CUNY officials to register their concerns. After contact with numerous elected officials, including New York City Council Speaker Peter Vallone, Chancellor Reynolds made several modifications to the Volpe proposal (Tr. 701), so that Dr. Scelsa would work on admissions at the Office of Admissions Services at 31 Street, while the rest of the Institute goes to the College of Staten Island. While rumors of the proposed modifications to the Institute were rampant, no one in the University hierarchy ever formally notified those affected by the plan of a move to take effect on September 1, 1992, until a letter dated August 26, 1992. (Pl.Ex. 20). Vice–Chancellor Kiezs was in charge of sending out this notification. (Tr. 1112–13). Only Dr. Scelsa was notified by letter dated August 26; other employees were notified by letter dated August 28. (Tr. 1165).

### D. The Alleged Retaliation Against Plaintiffs

Dr. Scelsa and the Institute have played a significant role in the formulating of various civil rights complaints against CUNY. (Tr. 306–08).

Deputy Chancellor Muciolo testified that he was aware that plaintiffs had filed a discrimination complaint against CUNY with the Department of Labor and was aware that Dr. Scelsa was one of the named complainants. (Tr. 1072–73).

Dr. Scelsa asserts that his claims of retaliation are bolstered by proof that CUNY attempted to forestall his complaining of civil rights violations by, at one point, forbidding him to speak to public officials regarding CUNY's actions. (Pl.Ex. 28)

Plaintiff has alleged a widespread pattern and practice of discrimination against Italian–Americans at CUNY. On July 27, 1990 numerous Italian–American complainants filed a class action complaint with the Department of Labor regarding this alleged pattern and practice (Plaintiff's Exhibit 1). This complaint was signed by Dr. Castiglione, a CUNY faculty member at Queens College, and the contact person for the Italian–American Legal Defense and Higher Education Fund, the entity representing the plaintiffs in that complaint (Pl. Ex. 1). Plaintiff Scelsa and the Institute played a leading role in the Department of Labor complaint, assisting in its investigation and compilation. Dr. Scelsa and Dr. Castiglione arranged meetings with the listed complainants at the offices of the Institute (Tr. 308). Maria Fosco, Dr. Scelsa's secretary, also assisted in the filing of the complaint and offered secretarial support services (Tr. 345–46).

On August 26 and August 28 of this year (Tr. 1165) plaintiff and other members of the Institute were sent letters from the administration of the City University of New York, notifying them that on September 1, 1992, they and the Institute would be split up and moved to several of CUNY's units, and that the Institute, itself, would be relocated to the College of Staten Island from its current location on 43rd Street in rented space in the Grace Building in midtown Manhattan.

On September 9, 1992 plaintiff hurriedly sought and obtained a temporary restraining order blocking defendants CUNY and Chancellor W. Ann Reynolds from carrying out the planned move pending a hearing on plaintiff's motion for a preliminary injunction. From September 21 to October 6 this court heard testimony and received evidence relating to plaintiffs' civil rights claims.

### E. Allegations of Discrimination Against Italian Americans in Faculty Recruitment and in Employment

Plaintiffs have alleged a long history of discrimination at CUNY, a history going back several decades. See Calandra Report, and Pl.Ex. 17. Currently, as noted above, there is pending a civil rights complaint with the Department of Labor's Office of Contract Compliance, outlining a number of instances and practices of alleged discrimination against Italian–Americans. See Pl.Ex. 1.

In this action, plaintiffs have presented much evidence of individuals of Italian–American background suffering from discrimination, supplementing their statistical analysis with evidence of individuals suffering disparate treatment.

Plaintiffs' testimony shows numerous examples of individual Italian–Americans who suffered adverse employment decisions, without any satisfactory explanations by defendants of a legitimate non-pretextual reason for this treatment. For example, Professor Manfredi Piccolomini testified that he was discriminated against on the basis of his national origin in regard to a promotion he sought. Prof. Piccolomini filed a formal complaint, which was eventually settled, with the complainant being promoted to the position in question. (Tr. 99–101).

Dr. Vincenzo Milione, plaintiff's witness as to the statistical case against CUNY, also testified that he suffered as an individual from discrimination. Dr. Milione is currently Assistant Director of Research and Education at the Calandra Institute, a position he has held since March of 1988. He currently teaches mathematics at LaGuardia Community College, as an Adjunct Associate Professor, and has previously taught as an adjunct at City College and Queens College (Tr. 125–26). Dr. Milione has a B.S. in Physics and an M.S. in Earth and Space Science from the State University of New York (SUNY), Stonybrook, and a Ph.D. from SUNY, Buffalo (Tr. 126). His doctoral work focused on social engineering, i.e. the study of population groups and

demographics and the design of systems to address social problems (Tr. 127). Dr. Milione also worked at the United States Department of Transportation where he was a program manager (Tr. 128).

Dr. Milione testified that following standard application procedures he applied for a position within the University, a position for which he was extremely well-qualified on the basis of his education, training and experience. Not only did Dr. Milione not receive the position he sought, he did not even obtain an interview. Instead, the position went to an individual, Dr. Braswell, who was found to have plagiarized large sections of Dr. Milione's work.[2] Dr. Milione was eventually told by a member of the CUNY unit with which he sought a job that his position in the Institute was held against him. Dr. Milione's testimony was unrebutted by defendants (Tr. 187-96).

Additionally, Maria Grace La Russo testified credibly as to the discrimination suffered by her at Hunter College. Ms. La Russo was hired to be a counselor at Hunter College, with a mission to meet with students of all backgrounds and ethnicities but with a concentration among the Italian–American students. Ms. La Russo was hired in 1980, and up until the present day has received a chilly and ofttimes vicious reception (Tr. 407-31). During her decade at Hunter, Ms. La Russo has received her doctorate and a post-master's certificate (Tr. 412) and also has consistently received above average evaluations. (Tr. 413). Nonetheless, in her twelve years at Hunter Dr. La Russo has failed to receive a single promotion (Tr. 411). Credible testimony established that her association with the Institute was held against her by members of the Hunter administration.

In addition to the evidence detailing individual instances of discrimination, this court received statistical evidence regarding discrimination against Italian–Americans on a class-wide basis, in particular evidence concerning CUNY's failure to live up to the promises made in both the Kibbee Memorandum and the Murphy Letter. Not surprisingly, defendants contest the validity of the methodology used and the results obtained by plaintiffs.[3]

The crux of plaintiff's statistical evidence is comprised of two data surveys prepared by Dr. Milione. In the first, plaintiff utilized United States Census data of individuals with eight-plus years of post-secondary education (the "8+ years" criterion). Plaintiffs testify that they used the 8+ years criterion because the available census data does not include information on what advanced degrees census respondents have acquired. The plaintiff then filtered this data to develop the applicable labor pool by assuming that CUNY obtains its staff largely from the tri-state region; therefore, plaintiffs obtained the applicable labor pool by weighting the numbers of Italian–Americans in the tri-state region by 80%, and the Italian–American pool nationally by 20%, to arrive at the applicable labor pool of Italian–Americans available to CUNY (see testimony of Dr. Vicenzo Milione).

The second data survey involved an assessment of other area colleges and universities to determine the percentage of Italian–Americans employed in those institutions (Plaintiff's Ex. 35). The data in this survey were procured by "eyeballing;" i.e. by examining the faculty and staff rosters of the universities and colleges examined and counting apparently Italian surnames. (Plaintiffs acknowledge that this method

---

**2.** Dr. Milione eventually received recognition that the work in question was derived from his research and writings, and obtained a settlement with Dr. Braswell under which Dr. Milione received a portion of the royalties of the sales of the controverted work. This incident was known to CUNY at the time Dr. Milione submitted his application (Tr. at 194-95).

**3.** The only available useful statistical evidence is that generated by plaintiffs, as defendants have

not, in the decade and a half following the identification of Italian–Americans as a protected class, developed any significant statistical data of their own. In fact, it was only during the hearing that defendants assembled a statistical analysis, due to the fact that since CUNY had not compiled that data as it had promised it was forced to cull its data from that presented during testimony on behalf of plaintiff. See, e.g. Defendant's Ex. 2.

has an unavoidable degree of inaccuracy, since "eyeballing" fails to identify as Italian–American those who are but who do not have identifiable surnames, e.g. women who have changed their names through marriage) (Tr. 170–72).

Defendants contest the force of these statistics. In respect to the first data survey, defendants challenge both the validity of the 8+ years criterion as a measurement of those employable at CUNY, as well as Dr. Milione's weighting of the statistics to emphasize population availability from the tri-state region. Defendants also challenged the results of the survey on the grounds that it used old data from the 1980 census. Defendants presented their own expert evidence to review the data submitted by plaintiffs, Dr. John Mollenkopf. He is a CUNY Graduate Center faculty member currently on leave (Tr. 1312–1313), and he disputed both the usefulness of the 8+ years criterion as well as the geographical weighting used by plaintiffs.

Defendants' analysis raised some doubts that plaintiffs' statistical evidence regarding the available labor pool of Italian–Americans is 100% accurate. However, plaintiffs need not present a perfect depiction of what is certainly a complex demographic phenomenon. For example, while it would be preferable to use data of a more recent vintage than that from the 1980 census, there is no other more recent data base available. The results of the 1990 census were not known at the time Dr. Milione conducted the study. Plaintiffs, it appears, used the best available evidence, and defendants should not complain since they have failed to produce a superior data base. Plaintiffs have convinced this court that, regardless of its stated intention to increase Italian–American representation on the staff and faculty, the percentage of Italian–Americans in the CUNY workforce is significantly less than the available labor pool. Regardless of the inadequacies in plaintiff's survey evidence, this court concludes that while the exact percentage by which CUNY underemploys Italian–Americans is not ascertainable with the exactitude one might like, it is clear that CUNY's employment of Italian–Ameri-

cans is not only significantly less than what it should be, according to the available pool, it also is unconscionable given the existence of an affirmative action commitment on the part of CUNY. CUNY undertook an obligation to increase Italian–American representation; regardless of the exact breadth of the available labor pool, CUNY must undertake to increase the numbers of Italian–American employed at CUNY, absent a showing on its part that such a task cannot be accomplished.

Defendants have failed to articulate a legitimate nondiscriminatory reason for the CUNY employment regime under which the percentage of Italian–Americans has remained constant even though in 1976 the University identified Italian–Americans as a protected class and vowed affirmative action to increase the representation of Italian–Americans.

In the first place, plaintiffs' testimony that there are no Italian–Americans at the Graduate Center is undisputed (Tr. 282). Defendants have not presented any reason, legitimate or not, as to why this is the case. Secondly, defendants have provided no reasons for the current low employment percentage of Italian–Americans in the CUNY staff and faculty workforce. When defendants in a civil rights case such as this can provide no reasons for the under-representation of a protected class within a workforce, the inference is that the only rational way to explain the disparity is discrimination. When, in addition, there has been an affirmative statement on the part of the defendant as to an intent to increase such representation through affirmative action of one kind or another, such a failure to explain the employment disparity is even more suspect.

Additionally, plaintiffs can satisfy their initial burden via the production of statistical evidence, and such evidence may be received with additional force if supplemented with additional evidence of individuals "with similar experience and qualifications" suffering disparate treatment. *Wade v. Mississippi Cooperative Extension Serv.*, 528 F.2d 508, 516–517 (5th Cir.),

on remand 424 F.Supp. 1242 (N.D.Miss. 1976). This plaintiffs have done.

Also, plaintiffs' comparison of the percentage of Italian–Americans at area colleges and universities demonstrates that many similarly situated employers in the immediate geographical vicinity employ a much higher percentage of Italian–Americans on staff and faculty. This achievement appears to have been accomplished notwithstanding the fact that these other institutions lack the stated policy commitment that CUNY has voluntarily undertaken, with the Kibbee Memorandum and the Murphy Letter, to increase Italian–American representation.

Defendants never sought to explain this disparity in CUNY employment and that of other area colleges and universities, which leads this court to conclude that not only have plaintiffs shown sufficiently serious questions going to the merits so as to make them a fair ground for litigation, but they also have demonstrated a likelihood of success on the merits.

In addition, while defendants contest the applicability of the 8+ years criterion for hiring faculty, they seem to have forgotten that this case involves discrimination in non-faculty employment as well. Plaintiff's data illustrate under-representation of Italian–Americans in the CUNY administration. Many of the administrators who testified in this action have only Bachelor's Degrees; therefore it appears that the 8+ years criterion would be very helpful in indicating the potential pool of administrative employees. Defendants have not presented any evidence to counter plaintiff's statistical evidence that Italian–Americans are under-represented on CUNY's non-faculty personnel.

## II. CONCLUSIONS OF LAW

### A. Standards for a Preliminary Injunction

The criteria that determine whether a party is entitled to a preliminary injunction are whether plaintiff has shown (a) irreparable harm *and* (b) either (1) the likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. *Wallace Int'l Silversmiths v. Godinger Silver Art Co.,* 916 F.2d 76, 78 (2d Cir.1990).

Defendants claim, however, that since this action "implicates the public interest" (Defendants Supporting Memorandum of Law at 45) a higher standard must apply, mandating that plaintiffs show likelihood of success on the merits. Defendants' contention seems to be that any suit involving a public entity implicates the public interest by definition. Such a contention is clearly wrong, as a quick perusal of the case law regarding attempts to secure equitable relief against illegal action by state actors will reveal.

In the first place, the "public interest" (nowhere defined in defendants' papers) is too nebulous a standard to be applied consonant with the demands of due process. Almost every lawsuit involving a public entity implicates the public interest, almost by definition.

Secondly, the cases cited by the defendants, such as *Medical Soc. of New York v. Toia,* 560 F.2d 535 (2d Cir.1977) and *New York Pathological & X–Ray Laboratories v. Immigration & Naturalization Service,* 523 F.2d 79 (2d Cir.1975), as well as those noted by plaintiffs, make crystal clear that in this Circuit an action is deemed to implicate the public interest only when taken pursuant to a regulatory or statutory scheme. See, e.g. *La Plaza Defense League v. Kemp,* 742 F.Supp. 792 (S.D.N.Y.1990). Thus, the higher "likelihood of success on the merits" standard applies only in instances where plaintiffs are trying to halt government implementation of regulation, for example, and is required in that context because the challenged action has already been the subject of government process. Principles of federalism militate against overmuch interference in a State's rulemaking or legislative process by a federal district court; no such concerns are, however, implicated here. Here, in contradistinction, the challenged

decisions of defendant CUNY were taken with a high degree of secrecy, and the removal of the Institute was intended to take place with only the most minimal of notice to those affected. When a party is challenging as contrary to federal law the actions of a government actor, those actions are, by definition, not pursuant to a regulatory or statutory scheme. *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

*Plaintiffs will suffer irreparable harm*

The plaintiff's papers in this action have been, to say the least, inartfully drawn, leading to some confusion as to what the causes of action are and who are the actual parties to the controversy. Defendants contend that the only plaintiffs presented are the Institute and Dr. Scelsa as an individual. They further claim that as an arm of CUNY, the Institute cannot bring suit against the University. Plaintiffs, on the other hand, appear to present a more broadly-based complaint, with Dr. Scelsa as Director of the Institute representing the interests of the Italian–American community.

Throughout the lengthy hearing on the preliminary injunction, both plaintiffs and defendants treated this action as one in which Dr. Scelsa represented the interests of the Italian–American community vis-a-vis CUNY. Dr. Scelsa can legitimately represent those interests in court; since civil rights suits seeking to vindicate the rights of a minority have historically proceeded in this fashion. See, e.g. *NAACP v. Alabama*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). The caption of the complaint also indicates that Dr. Scelsa is suing "as Director" of the Institute, i.e. as flagbearer for the Italian–American community. It is clear from all the evidence and arguments presented by *all parties* that the questions of discrimination involved herein relate not only to Dr. Scelsa but to Italian–Americans as a group. Thus this court, in accordance with the postures of both sides, will treat this action as such.

Plaintiffs have shouldered their burden of demonstrating that the planned move of the Institute will cause irreparable harm, not only to Dr. Scelsa but to the Italian–American community. As the Second Circuit has ruled, "improper conduct for which monetary remedies cannot provide adequate compensation suffices to establish irreparable harm." *Paulsen v. County of Nassau*, 925 F.2d 65, 68 (2d Cir.1991).

Much of the community work of the Institution would be rendered extremely difficult due to the location of the campus of the College of Staten Island. The Institute, as guided by Dr. Scelsa, is involved in a wide array of community activities, involving the promotion of Italian–American interests as well as fostering intergroup harmony among the many racial, ethnic, and religious divisions of the metropolitan area. (Tr. 288–92). Uncontradicted testimony confirmed plaintiff's argument that the central Manhattan location of the Institute is central to this function.

Uncontradicted testimony also demonstrated the Institution and Dr. Scelsa's pivotal role in attempting to vindicate the rights of Italian–Americans via the lawful petition of elected officials and the submission of civil rights complaints with the appropriate authorities. The removal of Dr. Scelsa along with the relocation of the Institute to the College of State Island would render far more difficult the continuation of these activities. Defendant's argument that, if CUNY ultimately loses this lawsuit, all parties can be re-relocated and the relationships and the activities interrupted re-established without any harm to the plaintiffs, is unsupported by the evidence. Thus we find that plaintiffs have established that they will suffer irreparable harm if they are not granted the preliminary injunction they seek.

■ In addition, plaintiff has alleged violations of the constitutional right to the equal protection of the laws. The law in this Circuit is that a constitutional deprivation constitutes per se irreparable harm. *Covino v. Patrissi*, 967 F.2d 73, 77 (2d Cir.1992); *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir.1984).

## The Balance of Hardships

The balance of hardships also tilts decidedly in plaintiff's favor. Plaintiff, Dr. Scelsa, is threatened with loss of status in the CUNY community, and the removal of the Institute to the College of Staten Island. Defendants have, throughout this action, repeatedly pressed for shorter deadlines and a faster resolution of the issues involved (see, e.g. Tr. at 1393) so that they can remove plaintiff. The costs to defendants of continuing to keep the Institute in its current location are small in comparison to the importance of the issues involved. As noted by plaintiffs in their Memorandum of Law at 72, "the inability of persons to use the unique resources of the Institute is not financially compensable. The plaintiffs will suffer a hardship many fold that of the university if they lose."

*Plaintiffs have demonstrated sufficiently serious questions going to the merits to make them fair grounds for litigation.*

Defendants have argued that this court lacks the adjudicative authority to hear some of the claims presented in this controversy. Thus, in order to show a fair grounds for litigation or a likelihood of success on the merits, this court must first establish its capacity to hear the claims presented.

**4.** 42 U.S.C. § 1983 provides that "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

**5.** While plaintiff's complaint and following submissions, not models of clarity and cogency, did not specifically raise § 1981 as a ground for recovery, federal courts have the adjudicative authority to decide this issue by virtue of F.R.Civ.P. 8(a)(2) and 54(c). 8(a)(2) mandates that a party's pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." This the plaintiff has done in his attempt to obtain a preliminary injunction. In addition, F.R.Civ.P. 54(c) notes that the federal court issuing a judgment has authority to "grant the relief to which the party

### B. Subject Matter Jurisdiction

*Section 1981 and 1983*

Section 1983 does not by itself confer jurisdiction.[4] While 42 U.S.C. § 1983 provides plaintiffs with a cause of action, it does not confer subject matter jurisdiction on a federal district court. Federal jurisdiction over section 1983 claims is provided for by 28 U.S.C. § 1343(a)(3).

Section 1981, as amended by the Civil Rights Act of 1991, bars discrimination in the making and enforcement of contracts, defined in 42 U.S.C. § 1981 as "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."[5] District court jurisdiction is likewise conferred by 28 U.S.C. § 1343(a)(3).

*Title VI and Title VII*

28 U.S.C. § 1343(a)(4) gives the federal district courts jurisdiction over a suit "[t]o recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights."

42 U.S.C. § 2000d[6], Title VI, is one such statute that is hearable in district court via § 1343(a)(3).

Jurisdiction for 42 U.S.C. § 2000e–3(a)[7], Title VII, is also established under

in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings."

**6.** "No person in the United States shall, on the grounds of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." Defendants now and at all relevant times have received unspecified federal moneys.

**7.** Title VII reads in relevant part, that "It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, to discriminate against any individual, or for a labor organization to discriminate against any member thereof, because he has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under this title."

§ 1343(a)(3). The same analysis applies to 42 U.S.C. § 2000e–2(a).[8]

### C. Eleventh Amendment Immunity

*Section 1983 and 1981 claims*

Defendants allege that the Eleventh Amendment to the United States Constitution bars suit against CUNY.[9] The complaint is fashioned as one against both CUNY and Anne Reynolds "as Chancellor". It is therefore a suit against CUNY as an institution and the Chancellor acting in her official capacity.

■ States do not count as "persons" under 42 U.S.C. § 1983, and thus their 11th Amendment immunity bars suits for damages under that statute. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). "Section 1983 provides a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties. The Eleventh Amendment bars such suits unless the State has waived its immunity." 491 U.S. at 66, 109 S.Ct. at 2309, 105 L.Ed.2d at 55.

■ CUNY therefore may not properly be named as defendant in a suit for equitable relief under § 1983 since it qualifies as an arm of the State of New York. In *Kovats v. Rutgers*, 822 F.2d 1303 (3d Cir. 1987) the Third Circuit found that Rutgers University, although denominated the "state university," lost its Eleventh Amendment immunity from § 1983 damages suits because Rutgers could draw on private as well as state moneys to pay damages. This discretionary power rendered Rutgers liable to § 1983 damages lawsuits. Under this analysis, however, CUNY counts as an arm of the state. N.Y. Education Law § 6205(1) provides that New York State "shall save harmless and indemnify members of the board of trustees and any duly appointed member of the teaching or supervising staff, officer or employee of the senior colleges ... against any claim, demand, suit or judgment arising by reason of any act or omission to act by such person occurring in the discharge of his duties and within the scope of his service on behalf of such university." N.Y. Education Law § 6205(1) (McKinneys 1985). See also *Moche v. City University of New York*, 781 F.Supp. 160 (E.D.N.Y. 1992).[10]

This court, in *Silver v. City University of New York*, 767 F.Supp. 494, 499 (S.D.N.Y.1991), aff'd 947 F.2d 1021 (2d Cir. 1991) recently ruled that CUNY enjoys Eleventh Amendment immunity from § 1983 suits for damages or equitable relief. See also *Torres v. City University of New York*, 1991 WL 143359, 1991 U.S. Dist. LEXIS 9977 (S.D.N.Y.1991), which held that while the President of John Jay College of Criminal Justice, Gerald Lynch, is subject to the equitable relief provisions of § 1983, John Jay College itself is immune.

---

**8.** § 2000e–2(a) reads in relevant part: "It shall be an unlawful employment practice for an employer: (1) to fail or refuse to hire or to discharge any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employment or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex or national origin."

**9.** Earlier in the hearing defendants claimed that Eleventh Amendment immunity barred suit under § 1983 against all defendants; this position has since been modified and now the claim is that Eleventh Amendment immunity bars continuation of the § 1983 suit against CUNY alone.

**10.** However, a successful plaintiff can recover money damages from any entity of the CUNY system under § 1983 if the recovery is paid for out of revenues from New York City. Certain community colleges receive moneys from the City of New York, and thus under *Monell v. Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) can be characterized as non-state entities, and thus are liable to § 1983 suits for damages as well as for injunctive relief. See, e.g. *Moche v. City University of New York*, 781 F.Supp. 160, 165–66 (E.D.N.Y. 1992).

However, a state official lacks such immunity when sued for equitable relief. In *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), the Supreme Court ruled that state officials can be sued under § 1983 in their official capacity for injunctive relief, 105 L.Ed.2d at 58, n. 10. See also *Derechin v. State University of New York*, 731 F.Supp. 1160, 1164 (W.D.N.Y.1989) (state officials acting in their official capacity only count as "persons" for the purposes of § 1983 when "they are sued for prospective injunctive relief").

■ This distinction between CUNY as defendant and between Ann Reynolds as an official state actor, will avail defendants little in the instant controversy. For when prospective injunctive relief is sought, the Eleventh Amendment is no bar to using § 1983 as the vehicle for such relief. "Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'" *Will*, 491 U.S. at 71 n. 10, 109 S.Ct. at 2311 n. 10, 105 L.Ed.2d at 58, n. 10 (citing *Kentucky v. Graham*, 473 U.S. 159, 167, n. 14, 105 S.Ct. 3099, 3106, n. 14, 87 L.Ed.2d 114 (1985).) See also *Torres v. City University of New York*, 1991 WL 143359, 1991 U.S. Dist. LEXIS 9977 (S.D.N.Y.1991).

A § 1983 suit against Chancellor Reynolds in her official capacity will serve plaintiff's purpose of obtaining a federal forum for seeking to cure, through litigation, CUNY's allegedly discriminatory practices. (Chancellor Reynolds did not become Chancellor until September, 1990). In fact § 1983 has been used in this manner just recently against CUNY in *Levin v. Harleston*, 966 F.2d 85 (2d Cir.1992) (affirming in part and vacating in part *Levin v. Harleston*, 770 F.Supp. 895 (S.D.N.Y.1991). See also *Dube v. SUNY*, 900 F.2d 587, 595 (2d Cir.1990).

■ A § 1981 suit is treated in the same manner as a § 1983 action for purposes of Eleventh Amendment Immunity. Thus, while an award of damages against a state entity is not recoverable under § 1981, appropriate prospective injunctive relief would be available under the section, as well as attorneys fees as part of costs, when the suit is against the appropriate officials named in their official capacity.[11] There are extremely few legal rules as well established as this one. Defendants argue that since Chancellor Reynolds, acting in her official capacity, is an agent of CUNY, she therefore enjoys Eleventh Amendment immunity from plaintiffs' suit. This contention is clearly wrong, as a long line of cases, from *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908) to the present clearly demonstrates.

*Title VI and Title VII claims*

CUNY enjoys no immunity in regard to plaintiffs Title VI and Title VII claims. "Since Title VII abrogates the Eleventh Amendment, a properly brought cause of action could exist against defendant CUNY." *Moche*, 781 F.Supp at 166. See also *Ritzie v. City University of New York*, 703 F.Supp. 271, 276 (S.D.N.Y.1989).

*D. Procedural Requirements*

*Sections 1983 and 1981*

There is no exhaustion requirement for section 1983 actions, *Patsy v. Board of Regents*, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982), or for section 1981, *id.*

*Title VI*

In Title VI actions, one must first invoke administrative relief when seeking such relief would not be futile. "Where an agency has established an administrative procedure to insure that no person is denied benefits of a program receiving financial assistance from the agency and has adopted procedures for gathering informa-

---

**11.** Attorneys fees can be awarded for the counsel who help attain injunctive relief, since attorneys fees are seen as ancillary to such relief, and are thus not treated as a damages award for Eleventh Amendment purposes. *Missouri v.*

*Jenkins*, 491 U.S. 274, 279, 109 S.Ct. 2463, 2466–67, 105 L.Ed.2d 229, 237 (1989); *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978).

tion, investigating complaints and enforcing compliance with Title VI, plaintiffs are expected to exhaust those administrative remedies before seeking redress in the federal courts." *Wrenn v. Kansas*, 561 F.Supp. 1216, 122 (D.Kan.1983). Presumably, such an agency is the Department of Education, Office of Contract Compliance, with which the plaintiffs have already lodged numerous complaints. It is partly in response to defendants' alleged retaliation for such complaints that the current suit is brought.

■ However, the fact that an administrative procedure exists to address Title VI claims does not preclude suit on a Title VI cause of action in federal court before the exhaustion of such remedies. *Neighborhood Action Coalition v. Canton*, 882 F.2d 1012, 1015 (6th Cir.1989). With respect to Title VI cases as with similar cases, "civil rights actions are barred for failure to exhaust available administrative remedies only in limited circumstances." *Jones v. Niagara Frontier Transp. Auth.*, 524 F.Supp. 233, 236 [12] (W.D.N.Y.1981). We therefore find that since plaintiffs appear to have satisfied the procedural prerequisites of Title VI, this court can continue with the analysis and go to the likelihood of success on the merits.

*Title VII*

■ Under Title VII, administrative remedies need not be exhausted for federal courts to have subject matter jurisdiction to entertain claims. *Womble v. Bhangu*, 864 F.2d 1212 (5th Cir.1989). However, in order for an action to be properly brought, a claim must be filed with an appropriate agency. *Trevino–Barton v. Pittsburgh Nat. Bank*, 919 F.2d 874, 878 (3d Cir.1990). One must invoke, but not necessarily exhaust, means of administrative redress.

■ Title VII requires "that a party claiming discrimination must file a complaint with the EEOC within 180 days of the alleged act of discrimination" and thus a suit under Title VII in federal district

court is timely usually only if such charge was timely filed. *Torres v. CUNY*, 1991 WL 143359, *4, 1991 U.S. Dist LEXIS 9977, *11 (S.D.N.Y.1991); *Ritzie v. CUNY*, 703 F.Supp. 271, 278 (S.D.N.Y.1989). Charges can also be filed with other federal agencies or with the appropriate state agencies. *Moche v. City University*, 781 F.Supp. 160, 166 (E.D.N.Y.1992). However, this limitations period is not a jurisdictional prerequisite to suit in federal district court, and is subject to waiver, estoppel, and equitable tolling. *Zipes v. Trans World Airlines*, 455 U.S. 385, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982); *Mauro v. Board of Higher Education*, 658 F.Supp. 322, 324 (S.D.N.Y. 1986), aff'd 819 F.2d 1130 (2d Cir.1987).

■ Additionally, plaintiff need not exhaust or resort to administrative remedies where "the wrongs alleged could not or would not have been corrected by resort to the administrative hearing process," *J.G. v. Rochester City Sch. Dist. Bd. of Educ.*, 830 F.2d 444, 447 (2d Cir.1987); indeed, exhaustion doctrine does not apply here especially because "the petitioner may suffer irreparable injury if he is compelled to pursue his administrative remedies." *Von Hoffburg v. Alexander*, 615 F.2d 633, 638 (5th Cir.1980).

Here, the letters notifying Dr. Scelsa and other members of the Institute of its reconfiguration and relocation to the College of Staten Island went out only days before the move was to go into effect. This case is a perfect illustration of the exception to the exhaustion doctrine, as forcing plaintiff to first exhaust administrative remedies would be futile, given the time constraints. CUNY cannot tarry until the last minute in announcing its plans, and then argue that for plaintiff to seek relief through the courts is premature.

In any event, this court has jurisdiction to entertain plaintiff's suit for equitable relief to maintain the status quo, even if plaintiff is required to exhaust, and not merely invoke, his administrative remedies

**12.** Additionally, where the Title VI plaintiff is seeking a preliminary injunction, exhaustion of administrative remedies is not required. *Jones,*

524 F.Supp. at 237 (citing *Bryan v. Koch,* 627 F.2d 612, 620 (2d Cir.1980).

and has failed to do so. *Holt v. Continental Group,* 708 F.2d 87, 89 (2d Cir.1983); *Sheehan v. Purolator Courier Corp.,* 676 F.2d 877, 881 (2d Cir.1981).

Again, since we find that plaintiff has shown a likelihood of success on the procedural prerequisites for both Title VI and Title VII, we can then turn to the substantive merits of the Title VI and Title VII claims.

### E. On the Substantive Elements of the Causes of Action Involved in This Case, Plaintiffs Have Shown Either a Likelihood of Success on the Merits or Fair Grounds for Litigation

*Title VI*

■ In order to establish standing to sue under this statute plaintiffs must be the intended beneficiaries of the federal spending program. While this need not be pleaded in plaintiff's filings, it must eventually be proven in order for plaintiffs to recover under this section. *Wrenn v. Kansas,* 561 F.Supp. 1216, 1221 (D.Kansas 1983). Title VI's scope encompasses those actions forbidden by the Equal Protection Clause. See, e.g. *Davis v. Halpern,* 768 F.Supp. 968, 974 (E.D.N.Y.1991).

"The two elements for establishing a cause of action pursuant to Title VI are (1) that the entity involved is engaging in racial or national origin discrimination and (2) the entity involved is receiving federal financial aid. As in Title VII cases, discriminatory effect alone is sufficient to satisfy the first element, intent to discriminate need not be proven." *Jackson v. Conway,* 476 F.Supp. 896, 903 (E.D.Mo.1979), aff'd 620 F.2d 680 (8th Cir.1980). It was decided in *Guardians Ass'n v. Civil Serv. Com.,* 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983) that in a private action under Title VI proof of discriminatory intent is not required. While intent will help support an action, "disproportionate impact is subject to the Title VI regime." 463 U.S. at 591, 103 S.Ct. at 3226, 77 L.Ed.2d at 874. However, the Court in *Guardians* limited the relief available in private action Title VI suits where intent is not proved to the injunctive relief where suit is brought to

"identify the violation and enjoin its continuance." 463 U.S. at 596, 103 S.Ct. at 3229, 77 L.Ed.2d at 788. See also *Lau v. Nichols,* 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974).

■ Discriminatory impact, even absent proof of discriminatory intent, will suffice to support a private right of action under Title VI. "Under Title VI, plaintiffs must first establish that the proposed federally-aided administrative action involves 'some definite, measurable disparate impact.' *N.A.A.C.P. v. Medical Center Inc.,* 657 F.2d 1322, 1332 (3rd Cir.1981). If plaintiffs meet this initial burden, defendants must present a justification for their actions. The ultimate burden of proving illegal discrimination remains with plaintiff." *Coalition of Concerned Citizens v. Damian,* 608 F.Supp. 110, 127 (S.D.Ohio 1984) (involving a dispute over the siting of a highway in a predominantly minority community).

■ The elements of a disparate impact case are first that the plaintiffs show a discriminatory effect. The burden then shifts to defendants to advance a non-discriminatory reason for the controverted action(s), and then the burden shifts again back to the plaintiffs to demonstrate that the proffered non-discriminatory reasons are really pretextual. *NAACP v. Wilmington Medical Center,* 491 F.Supp. 290, 314–315 (D.Del.1980).

In regard to the Title VI claim, while plaintiff's showing may not rise to a level of likelihood of success on the merits (a question that, because it is unnecessary to the decision, will not be considered here), it does amount to a showing of sufficiently serious questions going to the merits to make them a fair ground for litigation.

All defendants have done is attack the degree to which the survey data maps reality. Taking into account plaintiff's overestimation of the reliability of the survey data as well as defendants overly negative estimation, this court finds that the data do indicate a significant disparity in the available pool and the numbers of Italian–Americans employed by CUNY on its staff and

faculty. All that is required is that the "statistical disparities must be sufficiently substantial that they raise an inference of causation." *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 995, 108 S.Ct. 2777, 2789, 101 L.Ed.2d 827, 845 (1988). Plaintiffs have shown that there is a good-size pool of sufficient magnitude so that CUNY has no legitimate excuse for not increasing the representation of Italian–Americans in the CUNY workforce in the sixteen or so years that the Kibbee Memorandum and the Murphy Letter have been in effect. This is not a case where one side contends that the other has not increased the representation of a protected group by an adequate amount, and where the other party claims that the amount of the possible increase is constrained by the available labor pool. Instead, we have here a controversy where, although the employer has a stated commitment to increase the representation of Italian–Americans, such percentages have not increased significantly, and in fact in many campuses of CUNY have actually decreased.

Plaintiffs have shown sufficiently serious questions going to the merits to make them a fair ground for litigation in regard to the Title VI claim. Essentially, plaintiff's case involves two challenges; even though plaintiff's papers have not lucidly articulated these claims, they are at the heart of plaintiff's case. The first challenge is to specific actions taken by CUNY, such as the relocation of the Institute, and the failure to promote or treat fairly and in a non-discriminatory manner the witnesses who testified at the hearing. Secondly, plaintiff is challenging the employment regime at CUNY, a regime that has resulted in a severe underemployment of Italian–Americans on CUNY faculty, administration, and staff. This court understands that the basic thrust of plaintiff's complaint is the group-wide discrimination claim which is bolstered by evidence of discrimination regarding individual Italian–Americans.

Thus, while CUNY may be able to proffer non-discriminatory reasons for discrete actions and for employment decisions taken with respect to specified individuals, plaintiffs may still prove their case if CUNY cannot legitimate an employment regime in which almost two decades of stated commitment to increase the representation of Italian–Americans has yielded no significant progress.

Thus, in terms of a systemic challenge to CUNY's hiring practices, plaintiff has shouldered the burden necessary to obtain a preliminary injunction.

Title VI may also support a retaliation cause of action, if plaintiff can show that adverse decisions followed Title VI lawsuits or claims of which defendants were aware. See *Davis v. Halpern*, 768 F.Supp. 968, 984–85 (E.D.N.Y.1991).

In the instant controversy, defendants have failed to articulate a legitimate non-discriminatory reason for the manner in which the relocation of the Institute and its staff was conducted. The removal was to take effect on September 1, 1992, a Tuesday. The letter to Dr. Scelsa was dated August 26, 1992, a Wednesday, and presumably sent to him immediately thereafter (Tr. 1164–65); letters to other staff members were dated the 28 of August, a Friday.

The administrator responsible for these notifications, Vice Chancellor Kiezs, met with Dr. Scelsa and other Institute staff members during the month of August on unrelated matters, after the decision to relocate the Institute had already been made (Tr. 1165). At no times during these meetings did she even mention in passing that come September 1, 1992, their work assignments would change radically, with some employees to be sent to different boroughs of New York City at least one hour away on public transportation from the current assignments.[13] No reason was presented by defendants for this odd timing.

---

**13.** Defendants, incredibly, contend that the Institute is not being moved; rather, they claim "new reporting lines were established for employees of the Institute." See Defendants' Response to Plaintiff's Proposed Findings of Fact and Conclusions of Law at 2. Such linguistic shenanigans do not change the fundamental fact that the Institute and its staff are the subject

During the planning of the relocation of the Institute, not one member of the Institute, least of all its Director, Dr. Scelsa, was privy to the planning of the move. This deliberate removal from the decision making loop, as well as the timing of the notification of removal, leaves this court with the impression that plaintiffs were left in the dark so as to forestall any effective challenge to or input into the move. Uncontradicted testimony also shows that when CUNY administrators felt it imperative to communicate with staff members they did so via facsimile transmission. Oddly enough, the complete reconfiguration of the Institute and the relocation of its staff around the city did not, in defendants' view, merit this rapid form of communication. Defendants, having given no reason whatsoever for deliberately refusing to effectively communicate to those affected by the relocation only leads to the conclusion that the motivation for these actions was retaliation for the Institute's role in assisting in the filing of civil rights complaints by Italian–American faculty and staff members.

Defendants have also failed to demonstrate that there was a non-discriminatory reason for relocating the Institute to the College of Staten Island, instead of elevating it at the Graduate Center, the locus for CUNY's graduate programs. The court finds that the only possible rationale for this odd placement is that defendants wanted to inhibit the Institute's effectiveness in seeking to validate the civil rights of Italian–Americans. Thus we find that on the Title VI cause of action, plaintiffs have shown a likelihood of success on the merits so as to satisfy even the higher standard for the granting of the preliminary injunction they seek.

Thus, this court finds sufficiently serious questions going to the merits of a disparate impact claim to grant a preliminary injunction pending trial. However, a convincing showing in terms of disparate treatment has not been made, as plaintiff has failed to adduce sufficiently compelling evidence of intentional anti-Italian–American animus on the part of CUNY.

In conclusion, as to the Title VI, cause of action plaintiffs have shown that they have satisfied the preliminary injunction standards of showing sufficiently serious questions indicating a fair grounds for litigation and a balance of hardships tipping in their favor.

### Title VII

Title VII has two theories: disparate treatment, and disparate impact. While the first requires either some direct showing or inference of discriminatory intent, the latter does not.

A prima facie disparate treatment Title VII case puts on the plaintiff "the initial burden of alleging she was in a protected group; acts of the employer disadvantaging the employee; and disparate treatment by the employer of comparably qualified or situated persons of different races or sexes [or national origin]." *Ritzie,* 703 F.Supp. at 279. Once plaintiff meets his or her burden of showing qualifications for the positions denied, defendants must then articulate a non-discriminatory action for the conduct in question. *Silver v. CUNY,* 767 F.Supp. 494, 497 (S.D.N.Y.1991). The burden then shifts back to the plaintiff to show that these proffered reasons are pretextual. This "three-step" procedure is central to Title VII litigation, *Budd v. CUNY,* 749 F.Supp. 86, 88 (S.D.N.Y.1990), and such burden shifting determines the effect of the evidence adduced at trial. See, e.g. *Donaldson v. Merrill Lynch & Co.,* 794 F.Supp. 498, 503 (S.D.N.Y.1992).[14]

---

of CUNY's plans to relocate and reorganize the Institute, as the testimony and the evidence unequivocally establish.

**14.** "The plaintiff bears the initial burden of establishing by a preponderance of the evidence, a prima facie case of discrimination. *McDonnell Douglas [Corp. v. Green],* 411 U.S. [792] at 802, 93 S.Ct. [1817] at 1824 [36 L.Ed.2d 668 (1973) ]. If the plaintiff carries her burden, thus creating a rebuttable presumption of discrimination, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason for the employees rejection." Id. The employer's burden is one of production only; it need not persuade the court that it was actually motivated by the proffered reason, but rather must put forth evidence that raises an issue of fact as to whether the reason was discriminatory. [*Texas Dept. of Community Affairs v.] Burdine,* 450 U.S. [248] at 254, 256, 101 S.Ct. [1089, at] 1094, 1095

While in a disparate treatment case, proof of discriminatory intent is required, in some cases it can be inferred from the "mere fact of difference in treatment." *Murphy v. Middletown Enlarged City School Dist.*, 525 F.Supp. 678, 689 (S.D.N.Y.1981). While mere statistics alone will not suffice to make plaintiff's prima facie case, "gross statistical disparities can establish a prima facie case of discrimination." *Silver*, 767 F.Supp. at 498. See also *Clady v. Los Angeles*, 770 F.2d 1421, 1427 (9th Cir.1985). Plaintiff can indirectly prove wrongful motivation in cases involving a protected class "from a sufficient showing of disparity between members of the plaintiff class and comparably qualified members of the majority group." *Segar v. Smith*, 738 F.2d 1249, 1265–66 (D.C.Cir.1984). "This usually means providing evidence—often in statistical form—of a disparity in the position of members of the plaintiff class and *comparably qualified* whites." *Id.* at 1267 (emphasis in original). If plaintiffs identify a significant disparity, they may even be freed from the burden of identifying the exact practice which caused the disparity, leaving that to the employer to identify and justify. *Segar*, 738 F.2d at 1271 ("employer's claim that it cannot isolate the cause of the disparity will be unlikely to deflect the force of the inference of discrimination from plaintiff's [statistical] proof").[15]

For the same reasons discussed above in the Title VI section, this court finds against plaintiff's request for a preliminary injunction on the grounds of Title VII's disparate treatment prong. Again, this court finds a sufficient showing of discriminatory intent lacking.

In a disparate impact prima facie case, however, no showing of intentional discrimination need be made; instead, plaintiff must make out a practice of actions with discriminatory effect. "Under the disparate impact theory, a prima facie case is established by showing that a particular job requirement or standard of selection operates to select applicants for hire or promotion in a pattern significantly different from that of the pool of applicants. Under this theory a prima facie case is established even if the job requirement at issue is facially neutral and even if no showing of intentional discrimination is made." *Kachel v. Pueblo*, 743 F.Supp. 749, 756 (D.Colo.1990) (citations omitted). The burden that the plaintiff must carry is to show that defendants selection procedures have resulted in a pattern of employment in which members of the protected class are selected in numbers less than that which would be selected from the pool of qualified persons if there was no discrimination. Under this theory, plaintiffs must identify the practice on the part of the defendants that has led to the disparate impact. *Sousa v. Hunter*, 739 F.Supp. 756, 760 (E.D.N.Y.1990) (citing *Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 994, 108 S.Ct. 2777, 2788, 101 L.Ed.2d 827, 845 (1988)). However, even utilizing disparate impact analysis, plaintiffs need not identify with precision the exact procedure or practice that has caused the disparate impact; instead, even discretionary and subjective employment practices are subject to the Title VII regime. *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988).

A key element of a disparate impact case is the definition of the relevant labor pool. One definition of a municipality's labor pool is the geographical area from which private employers in the city draw their workers. *Newark Branch NAACP v. Harrison*, 940 F.2d 792 (3d Cir.1991).

[67 L.Ed.2d 207 (1981) ]; *Board of Trustees v. Sweeney*, 439 U.S. 24, 25 n. 2, 99 S.Ct. 295, 296 n. 2, 58 L.Ed.2d 216 (1978); *Meiri [v. Dacon]*, 759 F.2d [989] at 996 [2nd Cir.1985]. If the defendant produces such evidence, the presumption of discrimination disappears and the burden again shifts to the plaintiff to show that the articulated reason is merely a pretext for discrimination."

**15.** The *Segar* court justified placing this burden on the employer once the plaintiff class identifies a significant statistical disparity by noting that to place the burden on the plaintiff in such instances "permits challenges only to readily perceptible barriers; it allows subtle barriers to continue to work their discriminatory effects, and thereby thwarts the crucial national purpose that Congress sought to effectuate in Title VII." 738 F.2d at 1271–72.

Title VII may also impose on an employer the duty to correct employment imbalances once they are aware of them. *Snell v. Suffolk County*, 782 F.2d 1094, 1104 (2d Cir.1986) (employer has duty to correct atmosphere of racial hostility). In the instant controversy, the 1976 Kibbee memorandum evidences on the part of CUNY an awareness of past discrimination against Italian–Americans as well as a realization of the current under-representation of Italian–Americans. This court gathers from statistics presented at trial regarding the employment levels of Italian–Americans at CUNY that this awareness has not led to significant action on the part of defendants (See Plaintiff Ex. 8, 9, 10, 62).

An analogous situation was presented recently in *Bridgeport Guardians v. Bridgeport*, 933 F.2d 1140 (2d Cir.1991). This case involved litigation over Bridgeport's hiring practices for officers in its police force, in which minorities, especially African–Americans and Latinos, were severely under-represented. The City was aware of this problem and had been advised by an industrial psychologist as to means to correct the racial imbalance via a race-neutral method of selection. The Second Circuit court affirmed the trial court's finding that the City's failure to take positive steps toward correcting the under-representation of minorities, and its persistence in not improving its selection methods, amounted to a Title VII violation.

In the instant controversy, the situation is slightly more clear cut. CUNY has known since the latter half of the 1970's that Italian–Americans are under-represented in both faculty and non-faculty personnel. Numerous times, Italian–American legislators, community leaders, and other officials have brought to CUNY's attention their perception of discrimination. CUNY has undertaken, with the Kibbee Memorandum and the Murphy Letter, a pledge to address and seek to correct this imbalance.

Plaintiffs allege that under 42 U.S.C. § 2000e–3(a) they suffered retaliation for filing of discrimination charges. "To establish a prima facie retaliation claim, plaintiff must show: protected partic-

ipation or opposition under Title VII known by the alleged retaliator; an employment action disadvantaging the person engaged in the protected activity; and a causal connection between the protected activity and the disadvantageous employment activity." *Long v. A.T. & T. Information Systems*, 733 F.Supp. 188, 204 (S.D.N.Y.1990). Causality may be proven indirectly by a showing that the protected activity is followed by defendant's adverse treatment. *Id.* The same burden-shifting scheme at work in disparate treatment actions is in effect here as well: "once plaintiff has established a prima facie case, the employer can show a legitimate non-retaliatory reason for the alleged mistreatment. The employee is then entitled to prove that the employer's reason is pretextual." *Id.* An employee's actions complaining of discrimination are protected from retaliation regardless of the ultimate merit of the charges filed. *Gonzalez v. Bolger*, 486 F.Supp. 595, 600 (D.C.D.C.1980), aff'd 656 F.2d 899 (D.C.Cir. 1981).

The same facts that illustrate sufficiently serious questions going to the merits of the Title VI retaliation claim also apply in the Title VII context.

*Section 1983*

"In order to state a claim under § 1983, a plaintiff must allege that, first, the conduct complained of was committed by a person acting under color of state law, and, second, that such conduct deprived plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States. *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1912–13, 68 L.Ed.2d 420 (1981)." *Weg v. Macchiarola*, 729 F.Supp. 328, 333 (S.D.N.Y.1990); see also *Sean R. by Dwight R. v. Bd. of Education*, 794 F.Supp. 467, 469 (D.Conn.1992).

This court understands the gravamen of plaintiff's § 1983 complaint to be an Equal Protection Clause violation. It was understood that plaintiffs were alleging that Dr. Scelsa and the Institute have not enjoyed the equal protection of the laws since they were treated differently due to their status as Italian–Americans or Italian–American representatives. The hearing was conduct-

ed by all parties on the understanding that this was the core of the § 1983 cause of action. Defendants' Proposed Findings of Fact and Conclusions of Law treat plaintiffs' § 1983 claim as an Equal Protection violation (at page 51), a treatment fully justified by the hearing testimony. Indeed, plaintiffs alleged, at page 4 of their Second Amended Complaint, that the plaintiff Institute is being deprived of its constitutional right to the equal protection of the laws in that it "is being treated in a manner at substantial variance to that of similar organizations."

Plaintiffs now seem to claim in their post-Hearing papers that the § 1983 violation they had in mind involved an infringement of Dr. Scelsa's First Amendment rights. Since plaintiffs have at all times conducted the hearing as if Equal Protection was at the heart of the § 1983 claim, leading both the court and the defendants to believe accordingly, the § 1983 claim will be dealt with as such, and not as a First Amendment claim.

This court credits the testimony, largely uncontested by defendants, that the percentages of Italian–American faculty, administrators, and other staff at CUNY do not reflect the percentages of Italian–Americans in the student body or the population at large. The percentage of Italian–Americans in all staff bodies has stayed at extremely low levels, barely changing, sometimes decreasing, since 1978, even though both the Kibbee Memorandum and the Murphy Letter expressed clear directives to increase those numbers. (Tr. 144–48).

Thus we find that on their § 1983 claim plaintiffs have satisfied the requirements for the granting of a preliminary injunction.

*Section 1981*

Discrimination on the basis of national origin is encompassed within the scope of activities prohibited by section 1981. *St. Francis College v. Al–Khazraji*, 481 U.S.

604, 613, 107 S.Ct. 2022, 2028, 95 L.Ed.2d 582, 592 (1987).[16]

The elements of a section 1981 claim are identical to those of a Title VII disparate treatment action. See *Richards v. N.Y.C. Board of Education*, 668 F.Supp. 259, 264 (S.D.N.Y.1987), aff'd 842 F.2d 1288 (2d Cir. 1988). Unlike Title VII, section 1981 has no disparate impact prong: impact alone is insufficient since purposeful discrimination must be shown. *General Building Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 390, 102 S.Ct. 3141, 3149, 73 L.Ed.2d 835, 849 (1982); *Richards*, 668 F.Supp. 259 at 264; *Gibralter v. New York*, 612 F.Supp. 125, 129 (E.D.N.Y.1985).

To prevail under section 1981 plaintiff need not demonstrate that discriminatory animus was the sole motivating factor in defendant's employment decisions. See *Lenihan v. New York*, 636 F.Supp. 998, 1009–10 (S.D.N.Y.1985). Such motivation may also be established via circumstantial evidence. *Richards*, 668 F.Supp. at 265. Courts will accept such circumstantial evidence, *Lenihan*, 636 F.Supp. at 1009, due to the fact that an employer's decisions are often shrouded from clear discovery so that the only evidence available is circumstantial. If the employment decision can only be rationally understood as the result of discrimination, then courts will understand the circumstantial evidence presented to indicate the presence of a section 1981 violation.

A § 1981 violation may be established not only via presentation of evidence regarding defendant's affirmative acts but also by evidence regarding defendant's omissions when defendant is under some duty to act. For example, if there is an affirmative action plan in force, a publicized program of change recognizing a past of discrimination, or some other goal-directed agenda to increase the representation of a protected class, and the defendant has failed to adhere to these plans or programs, "common sense dictates that defendant's disregard of these guidelines is im-

---

**16.** Section 1981 has been explicitly applied to Italian–Americans. *Kemerer v. Davis*, 520 F.Supp. 256 (E.D.Mich.1981).

portant evidence of discriminatory intent." *Richards*, 668 F.Supp. at 266.

Such disregard can be found here. Throughout the hearing for the preliminary injunction, defendants accepted as valid the Kibbee Memorandum and the Murphy Letter. Defendants also admit that the number of Italian–Americans on the CUNY executive staff and faculty has remained constant, at around five percent, from 1978 to the present (Defendants Proposed Findings of Fact and Conclusions of Law at 32–33). Yet certain key individual administrators denied on record that Italian–Americans were either a protected class or the subject of affirmative action within CUNY. Sylvia Miranda, the ex-Director of the Office of Affirmative Action, stated that she knew of no plan to include Italian–Americans as a protected class, and that between 1988 and 1989, when she was Director, the Office had no plans whatsoever to increase Italian–American representation, 14 years after the creation of such a plan had been directed (Tr. 1273–1277). The present Chancellor of CUNY, W. Ann Reynolds, testified that Italian–Americans are not a designated affirmative action group. (Tr. 727–728). The Chancellor stated (Tr. 730) that she would not be convinced of the existence of any problem until the analysis of the 1990 United States Census was complete, even though the identification of the problem was made a decade and a half ago. This court must find that CUNY's current policy represents either an attempt to renege on the promises of the past or, by denying that such promises were ever made or intended to be kept, a reaffirmation of the original finding of discrimination against and under-representation of Italian–American that motivated the original Kibbee Memorandum and its reaffirmation with the Murphy letter.

CONCLUSION

This court finds that plaintiffs have shown irreparable harm and have presented sufficiently serious questions going to the merits to make them fair grounds for litigation and have shown a balance of hardships tipping decidedly in their favor. For these reasons, plaintiff's request for a preliminary injunction barring defendants from discriminating against Italian Americans in employment and relocating the Institute pending trial is granted.

"Once a violation of Title VII has been established, the district court has broad, albeit not unlimited, power to fashion the relief it deems appropriate. The bounds of the court's discretion are set in part by Title VII's goals of preventing discrimination and achieving equal employment opportunity." *Bridgeport Guardians*, 933 F.2d at 1149.

Defendants contend (See, e.g. Defendants' Proposed Findings of Fact and Conclusions of Law at p. 22) that the commitment embodied in the Kibbee Memorandum and in the Murphy Letter has absolutely no binding legal force because it was not obtained as a result of a court-ordered settlement or as part of a finding of discrimination. Not only does this contention ignore the historical context in which these obligations were undertaken, and the fact that CUNY made these promises partly in reaction to findings by certain legislative groups of past discrimination, it also misstates the applicable law. Under Title VII, voluntary compliance and achievement of a remedial scheme is preferred. *Bushey v. N.Y. Civil Serv. Com'n*, 733 F.2d 220, 226–27 (2d Cir.1984). CUNY's promises are not to be avoided merely because CUNY undertook its commitment to increase Italian–American representation without forcing all parties to suffer through what would probably be lengthy and expensive litigation. An employer is entitled to seek to remedy the under-representation of a minority via the voluntary adoption of schemes designed to increase such representation. A "manifest imbalance" that reflects under-representation of Italian–Americans at CUNY would serve to justify such a program. *Johnson v. Transportation Agency*, 480 U.S. 616, 631–32, 107 S.Ct. 1442, 1451–52, 94 L.Ed.2d 615, 630–31 (1987); *Steelworkers v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979). CUNY has been made aware with complaints and reports by government officials (See, e.g. the 1978 Calandra Report, Pl. Ex 16, the Report of the Massaro Commission,

Pl.Ex. 15, and the 1988 Letter from the New York State Italian–American Legislators Club, Pl.Ex. 17) of the problem of anti-Italian–American discrimination and under-representation, and has twice undertaken to rectify the imbalances identified (Pl.Ex. 4, 4A).

Defendant CUNY undertook an obligation to increase the numbers of Italian–Americans employed in its workforce, an obligation it has failed to discharge. Plaintiff is granted the relief sought, on the grounds that his presence at the Institute, as currently configured, has acted as a spur to CUNY. This court lacks the confidence that, pending trial, CUNY will address these problems without Dr. Scelsa at his present position. Dr. Scelsa must remain in place, pending trial. At trial, CUNY is invited to present for the court's satisfaction a plan to set the goals and fulfill the promises first undertaken in the 1976 Kibbee Memorandum but ignored since then.[17] Until this court is convinced that CUNY has presented a viable plan to achieve these long-unfulfilled promises, the status quo as to the Calandra Institute is preserved pending resolution of the issues presented as to same at trial. The Chancellor and CUNY are enjoined pending trial from discriminating against Italian–Americans in employment.

Submit Order on 15 days notice.

---

**17.** As long as CUNY demonstrates its commitment to fulfill the promises laid out in the Kibbee Memorandum and the Murphy Letter, the manner in which it does so is, of course, a matter best left to CUNY's discretion. Whether CUNY intends as part of its plan to elevate the Calandra Institute at the Graduate Center or at another location in Manhattan, with Dr. Scelsa as its head, or whether it relocates it elsewhere and places Dr. Scelsa or another qualified person as Director of CUNY's Italian–American affirmative action program, or whether another plan is ultimately adopted is up to CUNY. What must be done is to satisfy this court that CUNY is committed to achieving the results of greater Italian–American representation at all levels of the CUNY workforce. The route by which CUNY accomplishes this task is a matter best left to the University's self-governance. Of course, it might be easier to achieve these goals with the willing involvement of Dr. Scelsa and the Italian–American community in New York City—how CUNY does so is up to CUNY.