NEW YORK URBAN LEAGUE, INC., Straphangers Campaign, Andrea Mapp, Deborah Carrington, and Juan B. Gonzalez, Plaintiffs,

v.

METROPOLITAN TRANSPORTATION AUTHORITY, E. Virgil Conway, as Chairman and President of the MTA, the State of New York, George E. Pataki, as Governor of the State of New York, Joseph L. Bruno, as Temporary President of the New York State Senate and Sheldon Silver, as Speaker of the New York State Assembly, Defendants.

No. 95 Civ. 9001 (RPP).

United States District Court, S.D. New York.

Nov. 8, 1995.

Kirkpatrick & Lockhart L.L.P., New York City by Eric T. Schneiderman, Peter Vaughan, and Gerald A. Novak, for Plaintiff New York Urban League, Inc.

Zwerling, Schacter, Zwerling & Koppell, L.L.P., New York City by G. Oliver Koppell and Dan Drachler, for Plaintiffs Straphangers Campaign, Mapp, Carrington, and Gonzalez.

Dennis C. Vacco, Attorney General State of New York, New York City by Jeffrey I. Slonim and Gary E. Lesch, for Defendant State of New York.

Weil, Gotshal & Manges, New York City by Steven Alan Reiss, for Defendant Sheldon Silver.

Skadden, Arps, Slate, Meagher & Flom, New York City by Thomas Schwarz, Jeffrey Glekel, and Jeremy A. Berman, for Defendants Metropolitan Transit Authority and E. Virgil Conway.

## OPINION AND ORDER

ROBERT P. PATTERSON, Jr., District Judge.

Plaintiffs move pursuant to Rule 65 of the Federal Rules of Civil Procedure for a preliminary injunction to restrain Defendant, New York Metropolitan Transit Authority ("MTA") from implementing a fare increase announced October 19, 1995 and scheduled to take effect November 12, 1995.

Plaintiffs bring this action pursuant to Title VI of the Civil Rights Law of 1964 to obtain injunctive relief against the State of New York and the MTA. The announced change would increase the fare on New York City's subways and buses from $1.25 to $1.50, or 20%,[1] and the fare on the Long Island Railroad ("LIRR") and the Metro–North Railroad ("Metro North") (collectively the "commuter lines") by approximately 9%. Plaintiffs assert that pursuant to the announced fare increase "the allocation of the total available subsidies to [the New York City Transit Authority ("NYCTA")] and the Commuter Lines has been done in a manner which has the effect of discriminating against the predominantly minority riders of NYC-TA." (Complaint filed October 20, 1995 ("Complaint") ¶ 62.)

Plaintiffs also seek relief against Governor George Pataki, E. Virgil Conway, chairman of the MTA, Senator Joseph Bruno and Assemblyman Sheldon Silver pursuant to 42 U.S.C. § 1983 and the Fourteenth Amendment. Plaintiffs contend that these Defendants "have acted under color of state law to deprive plaintiffs of their rights to equal protection of the laws by disbursing government benefits in the form of transportation subsidies between predominantly white and predominantly minority transit riders in a discriminatory manner." (Complaint ¶ 66.)

Two Defendants, Governor Pataki and Senator Bruno, have filed a cross motion pursuant to Fed.R.Civ.P. 12(b)(6). These Defendants assert that the Complaint should be dismissed because it fails to state a claim against either of them.

On November 2, 1995, an evidentiary hearing was held on Plaintiffs' motion for a preliminary injunction. Because the fare increase is to become effective on November 12, 1995, this opinion addresses only Plaintiffs' motion for a preliminary injunction so that either party will have time to seek relief from the Court of Appeals before that date.

## BACKGROUND

### 1. THE PLAINTIFFS

The New York Urban League, Inc. ("NYUL") is a not-for-profit, community service organization with offices and programs located in the five boroughs of New York City. (Complaint ¶ 4.) NYUL was founded in 1919 and "combats the problems faced by African–Americans who face discrimination in jobs, housing, education and social services." (Id.)

The Straphangers Campaign ("Straphangers") is a part of the New York Public Interest Research Group Fund. It was founded in 1979. (Complaint ¶ 6.) Straphangers is dedicated to educating citizens "so that they may participate in public debate on issues relating to mass transit." (Id.)

The three individual plaintiffs are: Andrea Mapp ("Mapp"), an African–American woman who lives in New York County; Deborah Carrington ("Carrington"), an African–American woman who lives in Kings County; and Juan B. Gonzalez ("Gonzalez"), a Latino man who lives in the Washington Heights section of Manhattan. (Complaint ¶¶ 8–10.) All three individuals state that they are of modest income and that they use subways and buses as their sole means of transportation.

---

**1.** Express buses would be increased 25% from $4.00 to $5.00 except for the Staten Island express buses.

## 2. THE DEFENDANTS

The MTA is a public benefit corporation created in 1965 by New York Public Authorities Law ("P.A.L.") § 1263. The MTA is a component unit of the State of New York whose purpose is to continue, develop and improve "commuter transportation and other services related thereto within the metropolitan commuter transportation district . . . It shall be the further purpose of the authority, consistent with its status as the ex officio board . . . of the New York City Transit Authority . . . to develop and implement a unified mass transportation policy for [the New York Metropolitan area]." P.A.L. § 1264; (Affidavit of Frank Mauro submitted October 20, 1995 ("Mauro Aff."), Ex. 1 at 62.) The MTA's affiliated agencies include: LIRR, Metro–North, the Triborough Bridge and Tunnel Authority ("TBTA"), and NYC-TA.

The LIRR is a suburban commuter railroad that provides commuter rail services to residents of Nassau and Suffolk counties. (Complaint ¶ 20.) Residents of Westchester, Rockland, Orange, Dutchess and Putnam counties, are served by Metro–North. (Id. at ¶ 21.) Both of these entities are wholly owned subsidiaries of the MTA. (Id. at ¶¶ 20, 21; Mauro Aff., Ex. 1 at 62.)

The TBTA is a public benefit corporation which was created pursuant to P.A.L. § 550, et seq. The TBTA operates seven toll bridges, two tunnels, the Battery Parking Garage, and the New York coliseum. (Mauro Aff., Ex. A at 62.) The TBTA is a component unit of the MTA but it is organized as a separate legal entity and operates independently of the MTA. (Id.) The operations of the TBTA result in a substantial surplus which is allocated to the MTA and the NYC-TA according to a statutorily defined formula set forth in P.A.L. § 1219–a(2)(b).

The NYCTA is a public benefit corporation, organized pursuant to P.A.L. § 1200, et seq. which operates as a legal entity separate from the MTA. (Id.) The NYCTA, a com-ponent unit of the MTA, provides subway and bus service within four of the boroughs of New York City. (Id.)

The MTA board of directors consists of seventeen voting members, including the chairman and six non-voting members, four of whom are alternates.[2] P.A.L. § 1263(1)(a); (Complaint ¶ 9). The boards of directors of the NYCTA, the TBTA, and the MTA subsidiaries are composed of the same individuals as the board of the MTA. P.A.L. §§ 552(1), 1201(1); (Complaint ¶ 10; Tr. 147–148)[3].

## 3. SOURCES OF GOVERNMENT SUBSIDY FOR THE MTA

The operating revenue of each of the component units of the MTA, other than the TBTA, does not equal the costs of operations. As a result, each year the MTA, the NYCTA, the LIRR, and Metro North operate at a deficit, as do mass transit systems across the country. Accordingly, despite the statutorily allocated TBTA surplus described above, the MTA depends on subsidies from federal, state and city governments to pay for operating and capital costs not covered by revenue generated from fares. (Affidavit of Stephen V. Reitano, Chief Financial Officer of the MTA, dated October 30, 1995 ("Reitano Aff.") ¶ 10.)

### a. Federal Subsidy

The MTA receives funding for mass transit capital projects and operations from the Federal Department of Transportation. These subsidies are provided pursuant to the Urbanized Area Formula Program under 49 U.S.C. § 5307, the Capital Program as defined by 49 U.S.C. § 5309, and other federal grant programs. (Id. at ¶¶ 13, 14.)

### b. State Subsidies

Each year New York State's budget includes the following subsidies to the MTA and its subsidiaries and affiliates. (Mauro Aff. ¶ 14.) The payment of state subsidies is

---

**2.** Although there are seventeen voting members, there are only 14 votes because the board members from Dutchess, Orange, Putnam, and Rockland cast one collective vote. P.A.L. § 1263(1)(a); (Complaint ¶ 9).

**3.** "Tr." used throughout this opinion refers to the transcript of hearing on Preliminary Injunction held November 2, 1995.

subject to appropriation and to the availability of monies to fund such appropriations. (Reitano Aff. ¶ 15.)

### (i) Section 18–b Program

State subsidies for mass transit are provided from the State's General Fund through the Section 18–b Program administered by the State Commissioner of Transportation. Appropriations are to be made quarterly based upon a complex, statutory formula. In 1995, as in past years, payments to the NYCTA and the MTA for the transit and commuter railroad systems have been made on the basis of specific appropriations to NYCTA and to MTA through the annual local assistance appropriations bills rather than pursuant to the statutory formula. (*Id.* at ¶ 16.)

### (ii) Metropolitan Mass Transportation Operating Assistance Account ("MMTOA")

State subsidies for mass transit are also provided through a series of State and regional taxes which are deposited into the State Mass Transportation Operating Assistance Fund ("MTOA"). This fund consists of three accounts, including the public transportation systems operating assistance account, the urban mass transit operating assistance account, and MMTOA. State Finance Law § 88–a(4). Pursuant to State Finance Law § 88–a(7)(b), the monies in the MMTOA are to be paid in accordance with schedules specified in the State's local assistance budget for payment of operating costs of the public transportation systems in the metropolitan transportation district. The State's annual Local Assistance Budget specifies the dollar amount of the MMTOA subsidies for NYCTA and MTA.[4]  (Reitano Aff. ¶ 17.)

### (iii) Mortgage Recording Tax

The MTA also receives two portions of certain mortgage recording taxes collected in New York City (the "City") and counties in the mass transportation district ("MRT–1"

and "MRT–2"). MRT–1 monies are to be used first for the administrative and operating expense of the MTA, exclusive of NYCTA and the commuter lines. The remaining revenues are required by statute to be paid 55% to the MTA Special Assistance Fund ("SAF") for its transit account and the other 45% is required by statute to be paid to the SAF for its commuter railroad account. MRT–2 monies, after certain statutorily required transfers to entities outside of the MTA, are required to be applied to the payment of certain TBTA special obligation bonds issued to finance costs of commuter rail and NYCTA projects. P.A.L. § 1270–a. MRT–2 receipts in excess of such debt service requirements may be distributed as determined by the MTA. In the last three years, no such excess receipts were received and none are expected in 1995. (Reitano Aff. ¶ 18.)

### (iv) Metropolitan Transportation Authority Dedicated Tax Fund

In 1991 the State Legislature created the Dedicated Mass Transportation Trust Fund ("DTF"). Following appropriation by the Legislature, the DTF is to be utilized for the improvement and maintenance of mass transit facilities and for debt service and operating expenses of mass transit operating agencies. Pursuant to Chapter 56 of the Laws of 1993, the DTF is funded by a portion of the State-wide Supplemental Petroleum and Aviation Fuel Business tax receipts ("Additional PBT Receipts"). After payment of debt service, if any, 85% of the DTF is to be allocated pursuant to appropriation to NYCTA, and 15% to the commuter lines. (*Id.* at ¶ 19.)

### c. *City/Local Subsidies*

### (i) Section 18–b Program

Under the State's Section 18–b Program, the City and the counties served by the commuter lines are required to match on a joint basis the State's payment to the MTA

---

4. Monies in the MMTOA are obtained from: sales and compensating use taxes for the Metropolitan Transportation District; certain receipts designated under the State Tax Law, including a portion of the temporary regional mass transportation business tax surcharge on utility services, the temporary regional mass transportation business tax surcharge, temporary regional tax surcharge on banks and temporary regional tax on insurance companies; certain other designated receipts, including a portion of the receipt of the State-wide franchise tax on transportation and transmission corporations and associations; and a portion of the proceeds of State-wide Supplemental Petroleum and Aviation Fuel Business taxes on certain oil companies ("PBT receipts").

for the commuter lines with their respective shares determined by a legislatively established formula. Only the City is required to match the State's Section 18–b payments to the NYCTA. (*Id.* at ¶ 20.)

### (ii) Station Maintenance

The City is statutorily required to reimburse the MTA annually for the costs of operation, maintenance and use of each commuter railroad passenger station located within the City. Each of the seven counties in the MTA Mass Transportation District other than the City pays to the MTA an amount fixed by statute for the operation, maintenance and use of the commuter lines' passenger stations within each such county. (*Id.* at ¶ 21.)

### (iii) School Fare Reimbursement

Prior to October 1994, the City reimbursed the NYCTA for the costs of its reduced fare program for school children. All of such money was paid to NYCTA. The fact that the City did not make such payments in 1994 and has only agreed to make a reduced payment in 1995 has caused NYCTA operating deficits in 1994 and 1995. (*Id.* at ¶ 22.)

### (iv) Paratransit/Elderly and Disabled Reimbursement

The City pays or reimburses NYCTA for a portion of the costs associated with providing transportation services for elderly and disabled persons. All of such amounts are paid to NYCTA. (*Id.* at ¶ 23.)

### 4. *THE APPLICABLE STATUTE AND REGULATION*

The Plaintiffs' first cause of action pursuant to which injunctive relief is sought by the instant motion is grounded on Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and one of the regulations established by the Department of Transportation pursuant thereto, 49 C.F.R. § 21.5.

Title VI of the Civil Rights Act of 1964 reads as follows:

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to

discrimination under any program or activity receiving Federal financial assistance. 42 U.S.C. § 2000d.

The federal regulation relied on by the Plaintiffs, 49 C.F.R. § 21.5, reads in pertinent part:

> § 21.5  Discrimination prohibited:
>
> (a) General: No person in the United States shall, on the grounds of race, color, or national origin be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination under, any program to which this part applies.
>
> (b) Specific discriminatory actions prohibited:
>
>> (1) A recipient under any program to which this part applies may not, directly or through contractual or other arrangements, on the grounds of race, color, or national origin:  (i)–(vii)
>>
>> (2) A recipient, in determining the types of services, financial aid, or other benefits, or facilities which will be provided under any such program … may not, directly or through contractual or other arrangements, utilize criteria or methods of administration which have the effect of subjecting persons to discrimination because of their race, color, or national origin. …"

49 C.F.R. § 21.5.

### *DISCUSSION*

### 1. *APPLICABILITY OF TITLE VI TO THE MTA AND THE STATE*

Plaintiffs maintain that 1990 Census figures show that 54% of the NYCTA bus ridership and 55% of the subway ridership are African–American, Latino, or Asian, (Affidavit of Barbara Sobol dated October 20, 1995 ("Sobol Aff.") ¶ 8, Ex. 2; Affidavit of Dennis Wolcott submitted October 20, 1995 ("Wolcott Aff.") ¶ 11, Ex. 3), and that a 1994 MTA telephone survey shows 56.8% of subway riders and 61.7% of bus riders are African–American, Latino, or Asian, (Sobol Aff. ¶ 5, Ex. 1). An analysis of the 1990 Census figures shows that in New York City 646,679 employed whites of non-Hispanic origin rely on the subways or buses as their primary

means of transportation to work and that in comparison 969,398 employed persons who are African–American, Asian or of Hispanic origin rely on the subways or buses as their primary means of transportation to work. This represents approximately a 40%/60% ratio. (Affidavit of Terry Rosenberg, Director of Population Studies Unit as the Community Service Society of New York ("CSS"), dated November 1, 1995 ("Rosenberg Aff."), Ex. 1.)

An MTA 1995 tracking survey states that 54% of subway and bus riders who are over 18 years of age and use the NYCTA system four or more times a week are non-white and 46% are white. (Affidavit of Gary Caplan, dated October 30, 1994 ("Caplan Aff."), Ex. G.)[5]

Plaintiffs assert that a substantial majority of the commuter line users are white. An analysis of 1990 Census figures by the Population Studies Unit of the Community Service Society shows that of the 113,123 employed persons using the LIRR as a primary means of transportation, 12.9% were non-white and of the 63,176 employed persons using the Metro North, 16.4% were non-white. (Rosenberg Aff., Ex. 1.) The MTA provides figures showing that the passengers on the commuter lines are about 80% white and 20% non-white according to 1990 Census figures. (Caplan Aff., Ex. G.) The MTA also provides the results of a 1994 tracking survey which show that 87% of the riders of the LIRR are white. (*Id.*)

Based on these demographics, Plaintiffs maintain that the fare increase has "the effect of subjecting [them] to discrimination based on race, color, and national origin." 49 C.F.R. § 21.5(b)(2). The gist of Plaintiffs' argument is that although the persons using the NYCTA to get to work outnumber the number using the commuter lines by a ratio of nine to one, the operating subsidies in prior years have only been distributed on a two to one basis as shown by the November 19, 1991 Memorandum to the MTA Board by

Mortimer L. Downey (Mauro Aff., Ex. 4), and the proposed fare increase exacerbates this imbalance because pursuant to the fare increase, employed persons dependent on the subways and buses as their primary means of transportation to work bear a higher percentage of the cost of operating the transit system they use. Thus, the fare structure proposed by the MTA results in the predominantly minority riders of the NYCTA receiving less benefit from the governmental subsidies than the predominantly white, and far fewer, riders of the commuter trains.

The MTA argues that the establishment of fares does not implicate a right under 49 C.F.R. § 21.5(b)(2) of the Department of Transportation regulations and that the absence of explicit language pertaining to the establishment of fares in the examples of prohibited discrimination listed in Appendix C to 49 C.F.R. Pt. 21 demonstrates that fare increases do not fall within the reach of the Regulations. (Memorandum of Law on Behalf of Defendants MTA and E. Virgil Conway in Opposition ("Defs. Mem. in Opp.") at 13.)

■ As to Plaintiffs' reliance on 49 C.F.R. § 21.5(b)(2), the MTA counters that, as stated in paragraph 35 of Plaintiffs' Complaint, the subsidy distribution between the NYCTA and the commuter lines does not constitute a determination of financial aid subject to 49 C.F.R. § 21.5(b)(2) because the subsidies to MTA and its component agencies are either determined by statutory allocations or by state appropriations to the commuter lines and to the NYCTA. (Defs.Mem. in Opp. at 10.) The subject of this motion, however, the proposed fare increase, is a revenue producing measure which is independent of, and unaffected by, statutory allocations or state appropriations. In determining the fare increases the MTA and the NYCTA considered the alternatives of reducing the operations of the agencies (types of services offered) (Tr. 193) and facilities to be provided (Tr. 144).

---

5. Materials compiled by the MTA demonstrate that there were a total of 1,531,859,000 revenue passengers on the NYCTA's buses and subways during 1994, whereas the commuter lines carried a total of 135,090,000 revenue passengers during 1994. (Affidavit of Robert Paaswell, submitted October 20, 1995 ("Paaswell Aff."), Ex. 2 at III–A–18, line 4; III–A–19, line 4; III–C–19; III–D–17; and III–D–18.) A revenue passenger is used in the table to enumerate each use of the system by a passenger who pays a fare.

Thus, even if it did not involve considerations of financial aid, the determination to raise the fares is the type of determination encompassed by 49 C.F.R. § 21.5(b)(2).

Defendant MTA argues that the fare increase is not subject to scrutiny under 49 C.F.R. 21.5(b)(2) because the fares apply equally to minority and non-minority riders. (Defs. Mem. in Opp. at 15.) In support of its argument, the MTA points to *Alexander v. Choate*, which held that the imposition of a 14 day limit on hospitalization for both handicapped and non-handicapped patients did not violate § 504 of the Rehabilitation Act of 1973 because the rule subjected both classes of users to the same durational limits. *Alexander v. Choate*, 469 U.S. 287, 302, ·105 S.Ct. 712, 720, 83 L.Ed.2d 661 (1985). Here, however, the fare increase proposal of MTA which affects all persons dependent on mass transportation in the New York Commuter Transportation District served by MTA is not so uniform. Since the proposal is to raise fares 20% for the NYCTA on which almost 60% of the riders are minority and to raise fares only 9% for the riders on the commuter lines which are over 80% white, the proposal must be carefully reviewed.

■ Under Title VI the State of New York can be held liable along with the MTA, even if it is not included in the definition of a program, if it is responsible for the Title VI violation by creating the recipient, the MTA, and participating in the Title VI violations. *See Association of Mexican–American Educators v. State of California*, 836 F.Supp. 1534, 1543 (N.D.Cal.1993). *Cf. United States v. City of Yonkers*, 880 F.Supp. 212, 232 (S.D.N.Y.1995) (the plain language of 42 U.S.C. § 2000d–7(a)(1) is· reinforced by the fact that Congress amended Title VI to make clear that the statute authorizes suit against an entire system for the discriminatory practices of a discrete program within that system receiving federal funds).

Under these circumstances it appears that Title VI and 49 C.F.R. § 21.5(b)(2) apply to the actions of the MTA and the state asserted in the Plaintiffs' Complaint.

**6.** Plaintiffs are 'not required to exhaust administrative remedies prior to initiating a federal action under the regulations to Title VI. *Scelsa v.*

## 2. THE REQUIREMENTS FOR INJUNCTIVE RELIEF

■ Under Rule 65 of the Federal Rules of Civil Procedure a court may grant injunctive relief only where the moving.party shows

(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

*Jackson Dairy, Inc. v. H.P. Hood & Sons,* 596 F.2d 70, 72 (2d Cir.1979).[6]

### a. *Irreparable Harm*

■ An injury is irreparable when a monetary award is not available. *Jackson Dairy,* 596 F.2d at 72. It seems beyond dispute that, if the fare increase as proposed constitutes improper discrimination under Title VI, the individual Plaintiffs and members of the minority groups represented by the Urban League and the Straphangers will not be able to get any money paid for fares returned when this· litigation is completed. The administrative difficulty of establishing which individuals engaged in travel on the NYCTA would be insurmountable. Furthermore, Plaintiffs' supporting affidavits amply demonstrate that a high percentage of the minority group members in question receive public assistance or are among the working poor and would undergo considerable hardship prior to any final judgment being rendered.

■ Indeed, monetary awards are also unavailable to Plaintiffs or to any member of the minority groups because no intentional discrimination has been alleged or shown. *Guardians Association v. Civil Service Commission of the City of New York,* 463 U.S. 582, 595–97, 103 S.Ct. 3221, 3228–30, 77 L.Ed.2d 866 (1983). Accordingly, the Plaintiffs have demonstrated irreparable harm.

*City University of New York,* 806 F.Supp. 1126, 1139 (S.D.N.Y.1992).

The likelihood of success on the merits of Plaintiffs' claim must next be considered.[7]

### b. *Likelihood of Success*

█ Plaintiffs ground their claim against the MTA for injunctive relief on *Guardians Associations v. Civil Service Commission of the City of New York,* 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983). In *Guardians,* five Justices of the Supreme Court concluded that claims for declaratory or injunctive relief based on Title VI regulations adopted pursuant to 42 U.S.C. § 2000d–1 may be brought to enjoin governmental actions which have a prohibited disparate impact on minorities. *Guardians,* 463 U.S. at 584, n. 2, 103 S.Ct. at 3223, n. 2. *Cf. Alexander v. Choate,* 469 U.S. 287, 292–94, 105 S.Ct. 712, 715–16, 83 L.Ed.2d 661 (1985); *Georgia State Conference of Branches of NAACP v. State of Georgia,* 775 F.2d 1403, 1417 (11th Cir. 1985); *Scelsa v. City University of New York,* 806 F.Supp. 1126, 1140 (S.D.N.Y.1992).

The Department of Transportation regulation 49 C.F.R. § 21.5(b)(2) specifically prohibits "recipients" of federal funds from discriminating against minorities or from utilizing "methods of administration which *have the effect* of subjecting persons to discrimination because of their race, color, or national origin. . . ." 49 C.F.R. § 21.5(b)(2) (emphasis added). The MTA is a recipient of federal mass transit funds from the Department of Transportation. Under the regulations, a recipient is defined as "any State . . . or instrumentality thereof, any public or private agency, institution, or organization, or other entity . . . to whom Federal financial assistance is extended . . . for any program. . . ." 49 C.F.R. § 21.23(f).[8]

The President, who has the authority to review and approve federal agency regulations adopted pursuant to Title VI, has delegated this statutory power to the Attorney General pursuant to Executive Order 12,250. The Attorney General by a Memorandum to Heads of Departments and Agencies that Provide Federal Assistance to state and local agencies dated July 14, 1994 stated:

> Individuals continue to be denied, on the basis of their race, color, or national origin, the full and equal opportunity to participate in or receive the benefits of programs assisted by Federal funds. Frequently discrimination results from policies and practices that are neutral on their face but have the *effect* of discriminating. Those policies and practices must be eliminated unless they are shown to be necessary to the program's operation and there is no less discriminatory alternative.

Memorandum for Heads of Departments and Agencies that Provide Federal Financial Assistance, July 14, 1994; (Memorandum of Law in Support of Plaintiffs' Motion ("Pls.' Mem. Supp."), Ex. 2.)

█ The disparate impact standard enunciated by the Attorney General is similar to the test used in disparate impact employment cases under Title VII. Several courts have in fact recognized that standard applies in Title VI cases. *See Georgia State Conference of Branches of NAACP v. Georgia,* 775 F.2d 1403, 1417 (11th Cir.1985); *Larry P. v. Riles,* 793 F.2d 969, 982 (9th Cir.1984); *Campaign For Fiscal Equity, Inc. v. State of New York,* 86 N.Y.2d 307, 322, 631 N.Y.S.2d 565, 573, 655 N.E.2d 661, 669 (1995). When a disparate impact standard is applied, a plaintiff must show that a facially neutral practice or policy produces a racially dispro-

---

**7.** The Plaintiffs are required to demonstrate likelihood of success on the merits because they are seeking "to stay government action taken in the public interest pursuant to a statutory or regulatory scheme. . . ." *Able v. United States,* 44 F.3d 128, 131 (2d Cir.1995) (quoting *Plaza Health Laboratories, Inc. v. Perales,* 878 F.2d 577, 580 (2d Cir.1989)). The fair grounds for litigation standard is inappropriate here because the action being considered was "implemented through legislation or regulations developed through presumptively reasoned democratic processes" and therefore, "is entitled to a higher

degree of deference and should not be enjoined lightly." *Able,* 44 F.3d at 131. *See also Catanzano v. Dowling,* 60 F.3d 113, 117 (2d Cir.1995).

**8.** The State may also be a recipient since it receives federal funds from the Department of Transportation directly, (Reply Affidavit of Eric Schneiderman dated November 1, 1995 ("Schneiderman Reply Aff."), Ex. 2) and benefits from the mass transit funds received by its public benefit corporation, the MTA. *Cf.* P.A.L. § 1261(13).

portionate effect or impact and the burden shifts to the defendant to show a legitimate non-discriminatory justification or business necessity for the controversial action. If the defendant succeeds, the plaintiff may still prove its case by showing that other non-discriminatory means to achieve the same purpose are available to the defendants. *Scelsa*, 806 F.Supp. at 1141.

To demonstrate disparate effect on minorities, Plaintiffs rely on the affidavit of Robert A. Paaswell, the Director and Chief Executive Officer of the University Transportation Research Center ("UTRC"), which provides an analysis of the subsidies provided to the NYCTA and the commuter lines in 1994 in several ways: a) by comparing total revenue passengers to the total subsidies received by the two systems; b) by determining the total subsidy per revenue passenger; c) by determining the total subsidy per revenue vehicle mile (per subway car, train car, or bus); d) by determining the total subsidy per revenue passenger mile; and e) by measuring how much of the total cost of operation of a transit system is recovered by the fares paid by its passengers (the farebox operating ratio). Four out of five of Mr. Paaswell's bases for analysis ((a), (b), (c) and (e)), if appropriate tests for comparison, show that the passengers of the NYCTA are currently under-subsidized *vis a vis* the passengers of the commuter lines. Mr. Paaswell further argues that the most relevant calculation is (e), what he calls the farebox operating ratio, which measures how much of a transit system's operating costs are recovered by passenger fares. He asserts that (d), the subsidy per passenger mile/operating costs ratio, another method used to measure the percentage of costs paid by the passenger, is inappropriate because the economic transaction is a trip "from point to point" and results

in distortion because the average trip on a commuter line is over five times as long as the average trip on the NYCTA. (*Id.* ¶¶ 23–30.) [9]

The opposing affidavit of MTA Budget Director, Gary Caplan, submitted by the MTA states that the revenue per passenger mile/operating costs ratio (the reverse of the subsidy per passenger mile/operating costs ratio) is best used to measure the comparative benefits of NYCTA and the commuter lines. (Caplan Aff. ¶ 18.) Mr. Caplan asserts that under this calculation the commuter rail subsidy per revenue passenger mile in 1994 was $0.193 and in 1995 $0.195, as opposed to $0.205 for the NYCTA in 1994 and $0.200 in 1995. (*Id.* at ¶ 19, Ex.L.)

At the hearing, Mr. Caplan testified that Mr. Paaswell's calculation of the farebox operating ratio for the NYCTA and the commuter lines was misleading since it did not take total costs into account, particularly interest, depreciation, and amortization, and in certain instances the costs of providing police services. (Tr. 111.) He also stated that the farebox operating ratio was appropriate for measuring an agency's performance against prior years, but was not appropriate for measuring agencies against one another. Mr. Caplan contended that the farebox recovery ratio is a more comprehensive method of measuring revenue versus cost since it includes the costs of debt service and is "the ratio that you use for comparing agencies to agencies." [10] (Tr. 110–111.) Accordingly, Mr. Caplan pointed out that in 1994 the farebox recovery ratio for the NYCTA was 46.3%, for the Metro North the ratio was 44.4%, and for the LIRR the ratio was 38.1%.[11] (Tr. 113.)

9. Mr. Paaswell's contention that a "trip is a trip" is vigorously disputed by William B. Tye, an economist called by Defendants, who contended that the key issue is actual price paid. He defined discrimination as paying different prices for the same thing and stated that since the commuter trip was different in length, comfort and other ways, a different price was appropriate and did not constitute discrimination.

10. The MTA relies on calculations of both the Farebox Operating Ratio and the Farebox Recov-

ery Ratio. (*See* November 1991 Report of Mortimer L. Downey; Mauro Aff., Ex. 4 at 11–13.)

11. Mr. Caplan also explained that the LIRR riders have a lower farebox recovery ratio because the LIRR has "a higher labor cost structure stemming from labor agreements that have been reached over the years." If the LIRR had Metro North's cost structure it would have higher farebox recovery ratio than Metro North. (Tr. 114.)

Mr. Caplan also stated that Mr. Paaswell's discussion of farebox operating ratios, comparing fares and costs, for 1994, (Paaswell Aff. ¶¶ 27, 39, Ex. 2 at IV–A–18), was flawed in that it did not reflect the cost of transit police which, if included, would have dropped the NYCTA farebox operating ratio in 1994 from 58.9% to 51.6%, slightly less than the ratio for Metro North, 52%. (Tr. 116.)

At the hearing, Mr. Caplan produced, at the request of the Court, the MTA's calculation of the farebox recovery ratios for 1996, assuming the proposed fare increase went into effect. (*See* Plaintiffs' Exhibit 2.) Mr. Caplan stated that these figures were distributed to the MTA/NYCTA boards of directors when they considered the fare increases proposed by the MTA staff. (Tr. 149–150.) Exhibit 2 shows that the projected farebox recovery ratios, which the MTA uses to compare the agencies within the MTA, are as follows:

Farebox Recovery Ratios

|  | 1995 August, YTD | 1996 Forecast | 1999 Forecast |
|---|---|---|---|
| NYCTA | 48.3% | 60.5% | 54.6% |
| LIRR | 38.2% | 40.8% | 41.6% |
| Metro North | 47.4% | 49.6% | 49.8% |

These projections by the MTA demonstrate that the proposed fare increases result in a substantial reduction in the present percentages of subsidy benefit enjoyed by the NYCTA rider, and do not similarly reduce the subsidy benefit enjoyed by the commuter. Thus, in 1996 the costs of transportation for the LIRR rider covered by government subsidy would be 59.2%, for the Metro North rider 51.4%, and for the NYCTA rider only 39.5%.[12]

The cause for, and necessity of, the NYCTA fare increase must be examined. The exhibits submitted and testimony at the hearing reflect that MTA's fare proposal was an endeavor to do two things:

1) Meet a $45 million deficit projected for the end of 1995 (Tr. 199), and

2) to provide Pay–As–You–Go Capital funding. Reitano Aff., Ex. A at A–1. (Affidavit of Harvey A. Spector, Director of the Office of Management and Budget of the NYCTA, dated October 30, 1995 ("Spector Aff.") ¶ 12.)

The NYCTA is required under the Public Authorities Law to operate on a self-sustaining basis exclusive of capital costs, P.A.L. § 1202(1), and to set fares which will enable it to pay expenses when due from its reve-nues, P.A.L. § 1205(1). (Spector Aff. ¶ 5.) Thus the projected year-end deficit of $45 million takes on significance.

The undisputed record here is that the New York State budget passed in June 1995 reduced NYCTA's portion of MTOA dedicated funds by $86.55 million, a 16% reduction from the previous year. This same budget increased the MTOA funds provided to the commuter lines by $12 million, a 6% increase from the previous year. (Mauro Aff., Ex. 8.) The 1995 State budget also treated $220 million of the MMTOA funds in an inequitable manner by diverting the NYCTA portion to the State's general funds but leaving available $110 million to the commuter lines which the MTA has not seen fit to draw down. (*Id.* at ¶ 26.) (Tr. 31, 196–199.) But for these acts by the State of New York and the MTA there would be no year-end deficit and no increase in fares would be required at this time.

Furthermore, a review of the MTA's proposed Gap Closing Package, i.e., the proposed fare increases, (Reitano Aff., Ex. A at A–1), shows that the fare increase is planned to create a NYCTA stabilization fund of $41.2 million in 1996 "to balance later-year bud-

12. The MTA/NYCTA also voted to exempt one NYCTA unit from the impact of the fare proposal, namely the NYCTA express bus lines that serve Staten Island which are admitted to have pre-dominantly white riders. Thus, the MTA/NYCTA decision also has a disparate effect since express bus lines serving minority riders were not also exempted.

gets" and for a $125 million "Pay–As–You–Go Capital Fund".[13] (*Id.*) In 1997, the Stabilization Fund will be increased by $13.9 million and the Pay–As–You–Go Capital Fund would be increased by $125 million. (*Id.*) These amounts are such that it does not appear necessary for those persons using the NYCTA subways and buses to pay an increase of 25 cents a fare and causes those persons to shoulder about 60% of the costs of their transportation whereas other persons who are a part of the same metropolitan commuter transportation system pay only 40.8% and 49.6% of their costs of transportation.

The members of MTA Board are the ex officio members of the NYCTA Board. They considered the increases proposed by · the MTA staff simultaneously and in their separate capacities as members of the boards of the individual agencies. (Tr. 147–148.) Thus, the evidence presented at the hearing demonstrates that the proposed fare increase is the result of the utilization by the state and the MTA and its component agencies of "criteria or methods of administration which have the effect of subjecting [Plaintiffs] to discrimination because of their race, color, and national origin." 49 C.F.R. § 21.5(b)(2).

Plaintiffs have thus shown a likelihood of demonstrating that a facially neutral practice or policy will produce a racially disproportionate effect or impact. Consideration must now be given as to whether the Defendants have demonstrated legitimate, non discriminatory justifications or a business necessity for the action. *Georgia State Conference of Branches of NAACP*, 775 F.2d at 1417.

### c. *MTA's Justifications*

The MTA presented evidence that showed that its allocation from 1981 to 1991 of the capital funding budget had favored the NYCTA 80% to the commuter lines' 20% and that for the period 1992 to 1996, including projects of government funding expected to be received, NYCTA received 87% compared to the commuter lines' 13%. (Caplan Aff., Ex. J.) These funds however, were comprised almost entirely of City appropriations to the NYCTA or of Federal funds which were allocated by the Federal Department of Transportation to the NYCTA.[14]

Mr. Caplan also testified that of the total capital subsidies in 1994 for NYCTA and the commuter lines, NYCTA received approximately 75% and the commuter lines received approximately 25%.[15] (Defendants' Exhibit D.) The evidence has shown that the number of people who depend on the NYCTA as their primary means of transportation to work is approximately nine times greater than the number of people who depend on the commuter lines for this purpose. (Rosenberg Aff., Ex. 1.)

Disregarding this imbalance, the figures presented by the MTA apply to capital costs and not to costs of operating including debt service, amortization and depreciation which are the costs which apply to the setting of fares. P.A.L. § 1205. The evidence presented by the MTA does not provide any legitimate non-discriminatory justification for the larger proportionate fare increase imposed on Plaintiffs.

### d. *MTA's Business Necessity*

At the hearing, the MTA offered proof as to the business necessity of the action. The

---

**13.** Although the issue is not briefed, the applicable statutes suggest that Pay–As–You–Go capital funding of the NYCTA has not been authorized by the legislature. Section 1205 of the Public Authority Law allows the NYCTA to fix or adjust fares to be charged as may be necessary to maintain the operations of the NYCTA on a self-sustaining basis. P.A.L. § 1205. The operations of the NYCTA are deemed to be on a self-sustaining basis under § 1205 "when the authority is able to pay, from revenue from any funds granted or transferred to the NYCTA pursuant to any provision of law ... or from any other funds actually available to the authority, including the proceeds of borrowing for working capital purposes, the expenses of operation of the NYCTA as

the same shall become due." P.A.L. § 1205. *Cf.* P.A.L. §§ 1202(1).

**14.** The figures do not appear to take account of any Amtrak contributions to track bed improvements.

**15.** Additionally, Mr. Caplan pointed out that, rather than subways, minorities tend to use buses which pay a smaller percentage of their costs from the farebox than subways. (Tr. 133–134.) This seems irrelevant since the proposed fare increase for the NYCTA applies to both buses and subways.

MTA offered a copy of bond covenants which require the MTA to operate on a self-sustaining basis. (*See* Defendants' Ex. 5; Tr. 136–137.) Mr. Caplan then testified that absent a fare increase the MTA would have a $45 million operational deficit at the end of 1995[16]; that the so-called Silver plan to avoid any increase in fares would require the legislature in Albany to effectuate a restoration of $110 million to the MMTOA Fund from the State's General Fund required an appropriation of that money after March 31, 1996; that postponement of the use of the $125 million in the new capital plan expenditures for the NYCTA, counted on by the Silver plan was earmarked for expenditure after December 1996 and that even if those funds were utilized for operations, the MTA would still run out of funds in the first quarter of 1996; and lastly that the $85 million remainder (which the Silver plan would find in savings or as a result of arbitration with the City of New York) was not attainable in the time frame required to allow the MTA to operate at a self-sustaining basis. (Tr. 191–195.)

The evidence presented by the MTA supports the conclusion that, absent State appropriations or a substantial cutback in personnel with consequential cutbacks in operations, a fare increase for the NYCTA is a business necessity in the near future. This evidence, however, does not provide a business reason for the MTA to implement fare increases which would have a disproportionately adverse effect on a population of 969,398 minority employees or approximately 60% of the persons who use NYCTA subways and buses as their primary means of transportation to work. No business reason has been shown to demonstrate why the 173,000 riders of the commuter lines, over eighty percent of whom are white, should have approximately 60% and 50% of their transportation to work costs paid by government

subsidies while only 40% of those costs are paid for the 1.6 million persons, 969,000 of whom are minorities, who depend on the NYCTA subways and buses to get to work. (Rosenberg Aff., Ex. 1.)

In fact, the Defendants offered no evidence to support any business necessity for the disproportionate impact of the proposed fare increase on the NYCTA riders. They seem to argue that low commuter fares result in less use of automobiles on the City streets and thus, less traffic congestion and pollution. (*Cf.* Defs. Mem. in Opp. p. 24.) However, the Defendants offered no evidence that the boards of directors were presented with any studies to demonstrate that these undesirable effects would occur if the fare increase resulted in an farebox recovery ratio no higher than at present.[17] Thus, the Plaintiffs have demonstrated a likelihood of success on the merits and the Defendants have not shown any legitimate non-discriminatory justification or any business necessity for the fare increase as proposed. Accordingly, the Plaintiffs are entitled to injunctive relief.

### 3. CONSIDERATION OF NATURE OF RELIEF

In considering the nature of the injunctive relief to be granted, the Court has not been presented with sufficient evidence to determine in what manner, if any, the present discrepancy in farebox recovery ratios should be revised. Thus, the injunctive relief ordered should not be devised to affect the present imbalance in farebox recovery ratios.

### CONCLUSION

Accordingly, the MTA is hereby enjoined *pendente lite* from putting into effect the

---

16. Mr. Caplan acknowledged that the $45 million was a paper deficit since a pension contribution of $80 million for 1995 would be paid in January 1996. (Tr. 208.) Furthermore, John Casellini, Deputy Director of Budget Studies for the New York State Assembly Ways and Means Committee, testified at the hearing that $45 million is approximately 1.3 or 1.4% of the MTA's 1995 budget which was not out of line with deficits at past year-ends. (Tr. 202.)

17. There was no evidence of any demographic analysis of the fairness of the fare proposals presented to the boards of directors. It was acknowledged that the boards did not discuss the Title VI implications of the fare increase. (Tr. 147–148.)

increase in NYCTA fares it announced on October 19, 1995.

IT IS SO ORDERED.